322 A.2d 17.

RHODE ISLAND CONSUMERS' COUNCIL *vs.* ARCHIE SMITH, *in his capacity as Chairman of the Public Utilities Commission of the State of Rhode Island et al.*

THE NARRAGANSETT ELECTRIC COMPANY *vs. same.*

JULY 1, 1974.

PRESENT: Paolino, Joslin, Kelleher and Doris, JJ.

386

KELLEHER, J. On November 30, 1972, the Narragansett Electric Company (Narragansett) filed with the Public Utilities· Commission (the Commission) a proposed revision in its tariffs which would increase Narragansett's annual income attributable to its intrastate Rhode Island business by some $4,822,000. The increased tariff was to become effective on January 1, 1973. However, acting pursuant to G. L. 1956 (1969 Reenactment) §39-3-11, as amended by P. L. 1969, ch. 240, sec. 5, the Commission entered orders suspending the proposal pending its con-

sideration of the new tariff. Thereafter, there followed an extended public hearing at which the Rhode Island Consumers' Council (the Council) appeared in opposition to Narragansett's proposal.

On October 1, 1973, the Commission announced its decision. It rejected the proposed tariff but permitted Narragansett to file a new tariff which would increase its Rhode Island revenue by about $3,013,000 annually. Thereafter, relying on §39-5-1 the Council filed its statutory petition for certiorari. Later, at Narragansett's request, we issued the common-law writ of certiorari in order to review the Commission's findings, which the utility averred were erroneous. We have consolidated both proceedings.

Within recent times, we have pointed out that in any public utility rate case, there are three general determinations to be made. The first is the selection of an appropriate test period during which the utility's revenues, expenses, rate base and rate of return may be measured. The test period is usually a 12-month period. Second, there must be established the utility's rate base, which is its total investment in, or fair value of, the used and useful property necessarily devoted to the rendering of the regulated service. Once the rate base has been computed, with proper adjustments being made for the utility's operating expenses and revenues, all that remains is the last element, the setting of an allowable rate of return, that is, the percentage by which a utility's rate base is multiplied in order to determine the revenue needed to pay expenses and to acquire investment capital. The definitions of test period, rate base, and rate of return to which we have just alluded can be found in *Rhode Island Consumers' Council* v. *Smith*, 111 R. I. 271, 302 A.2d 757 (1973).

Narragansett's proposed tariff sought a rate of return figured at 7.94 per cent. The Council took a position that

388

a 7.25 per cent was just and reasonable. The tariff authorized by the Commission gives Narragansett a 7.60 per cent rate of return.

Here, the Council faults the Commission in many areas but lays great stress on the Commission's failure to reduce Narragansett's rate base by some $747,000 in unamortized tax credits and its failure to offset any increase in wage and salary expenses by an alleged increase in employee productivity. Conversely, Narragansett contends that the Commission erred by refusing to base the wage and salary adjustment for 1972 on a full 12-month period, by excluding from the rate base about $104,000 in prepaid insurance premiums and by miscalculating the amount Narragansett needs for its cash working capital. We will first consider the Council's contentions and then go on to those being pressed by Narragansett.

As we turn to our task, we are not acting as factfinders. Factfinding is the Commission's job. Our objective is to determine whether the Commission's decision and order are lawful and reasonable and whether the findings are fairly and substantially supported by legal evidence and sufficiently specific to enable us to ascertain whether the facts upon which they are premised afford a reasonable basis for the result reached. Necessary factual determinations need not be set out in precise language but they may be fairly and reasonably implied from the Commission's language and actions. *Rhode Island Consumers' Council* v. *Smith, supra.*

The Unamortized Investment Tax Credit

As the result of federal legislation granting a so-called "investment credit," the federal income taxes for which Narragansett became actually liable were reduced on and after January 1, 1962 by a sum equal to three per cent of the amount it invested in certain newly acquired depreci-

able equipment that formed part of its plant. Revenue Act of 1962, 26 U.S.C. §38, 76 Stat. 962. Narragansett took advantage of this congressional action and has recorded the tax credit in a separate account which it has amortized over the depreciable life of the property to which the credit applies. At the time of the hearing, the test-year balance in this account totaled $747,000. In computing its cost of services, Narragansett included an assessment for federal income tax expense that exceeded $3,500,000. Narragansett's computations did not include any reduction for $747,000. The Commission approved Narragansett's income tax calculations. The Council argues here, as it did before the Commission, that the tax credit should be treated as a "flow through" item and thereby reduce its tax expense by the $747,000. Narragansett contends that the Commission's "normalization" treatment of the credit was warranted.

"Flow through" and "normalization" are part of the ratefixer's everyday jargon. Under "normalization" the utility used the allowable liberalized depreciation to its advantage by taking the difference between taxes actually paid and the higher taxes reflected for ratemaking purposes as a cost of service and setting up the difference in its records as a deferred tax account. This account is then used as a source to supply a specific amount of depreciation over a specified period of time. It is obvious that the establishment of such an account obligates the utility to acquire funds to maintain that account. A principal source of these funds is the rates charged the consumer. However, when the flow-through technique is employed, the full benefit of the tax credit is immediately bestowed upon the customer. Farris & Sampson, *Public Utilities— Regulation, Management & Ownership*, 113-14 (1973).

In embracing the normalization approach, the Commission referred to findings it had made in an earlier pro-

ceeding entitled In Re: Tariff Filing Made by the New England Telephone & Telegraph Company on April 16, 1971, Docket No. 1092 (1973), where in pertinent part it ruled:

"We are convinced that the method we have used which results in a sharing of the benefits of the Investment Tax Credit by giving the consumer the benefit of the annual amortization and the Company the benefit of the use of the funds derived from the credit is a fair and reasonable approach to the treatment of this item."

The Commission also made reference to the intent of Congress in enacting a 1964 amendment[1] to the 1962 Revenue Act. By this amendment, federal regulatory bodies were prohibited from deducting the unamortized revenue from a utility's rate base. The prohibition, however, did not specifically bar deduction by a state regulatory body. *See, City of Pittsburgh* v. *Pennsylvania Public Utility Comm'n*, 208 Pa. Super. 260, 222 A.2d 395 (1966). The Commission further noted that similar tax credits, such as the "Job Development Credit," *i.e.*, the Work Incentive Program, 26 U.S.C. §46, as amended by Pub. L. No. 92-178, §107(a)(1), 85 Stat. 507 (1971), are available to a public utility only if the federal or state regulatory body does not reduce the rate base by the amount of unamortized tax credit.

The Commission appears to have been striving for consistency in the treatment of the rate base for the purposes of both federal and state computations. With the tax investment credit being included in the rate base on the

---

[1]Revenue Act of 1964, 28 U.S.C. §38 (see notes), as amended by Pub. L. No. 88-272, §203(e), 78 Stat. 35.

state level, the rate base figure will be one and the same for both federal and state purposes.[2]

In rejecting the approach advocated by the Council, the Commission has put a public utility operating in Rhode Island in conformity with those operating under federal regulations and at the same time permits the Rhode Island utility to take advantage of other available tax credits. The Commission balanced the obvious benefit to the consumer by a one-shot advantage of decreasing the rate base by some $747,000 for one year, against giving the consumer a long-term benefit that will extend over a number of years while at the same time giving the utility the use of the unamortized funds which will hopefully be used to generate further income and thereby reduce the cost of service. Flow through increases the revenue only for the test period but creates a revenue gap for the years that follow. It is a short-range approach to the problem, while the long-term normalization affords greater hope for stabilization of rates in the future.

We acknowledge that in January 1963, the Commission's predecessor had specifically directed Narragansett to reduce its rate base by the entire amount of its then unamortized tax credit. We need only say that today's administrators are not bound by any prior administrative orders as to what shall be included in the rate base. *See, Narragansett Electric Co.* v. *Kennelly,* 88 R. I. 56, 143 A.2d 709 (1958). The treatment to be given a tax credit is a matter within the discretion of the Commission. *New England Tel. & Tel. Co.* v. *Department of Public Utilities,* Mass., 275 N.E.2d 493 (1971). However, we see nothing in this record that indicates that the Commission's sanc-

---

[2]We recognize that our sister states are divided in the treatment of the investment tax credit, advocates for both inclusion and exclusion having substantial support. *See,* 1 Priest, *Principles of Public Utility Regulation* 138 (1969).

tion of the utility's treatment of its tax credit was arbitrary or unreasonable.

## Wage and Salary Adjustments

The Council maintains that the Commission erred when it failed to reduce wage and salary adjustments made to Narragansett's cost of service because of accompanying increases in the workers' productivity.

One of the Council's expert witnesses testified that Narragansett's increase of $684,000 in salaries should be decreased by an employee productivity factor which his studies showed was present. He stressed that his conclusion was based on an ever-increasing sale of power during the years from 1963 through 1972. He took the position that the improvement in the sales picture was due to the employees' extra efforts which in turn were motivated by larger paychecks. In fact, he told the Commission that the productivity had risen to a point where the profits attributable to the increased sales completely offset the additional salary expenses. However, Narragansett's assistant treasurer testified that he had reached a contrary result. He said that after considering the possibility of making some adjustment in this area, he rejected the idea because of the difficulty in measuring productivity. He maintained that there were many factors involved, only one of which related to the increased sales revenue.

The Commission acknowledged the difficulty of measuring with any degree of accuracy the productivity factor and concluded that in a day of galloping inflation, productivity has not kept pace with wage payments. The Council contends that such an observation was dehors the record and entitled to no weight. However, we are aware that in the exercise of its quasi-judicial functions the Commission has developed an expertise in the discharge of its administrative responsibilities to the point that it may certainly take "administrative notice" of what is gen-

erally accepted in the market place as fact. *See, Mullins* v. *Finch,* 319 F. Supp. 588 (D. Va. 1970).

The inclusion or exclusion of a productivity factor in ascertaining the full impact of the increased salaries and wages paid the utility's employees was an issue subject to a difference of opinion. The Commission found that Narragansett's assistant treasurer was more persuasive than the Council's expert. Its refusal to include a productivity offset in the wage and salary item finds support in the evidence. *Rhode Island Consumers' Council* v. *Smith, supra.* We see no error.

### Research and Development Expense

The Commission approved Narragansett's inclusion of an item which adjusted its 1972 cost of service by $23,000. This sum was the cost of having a nationally-known research company make a study of the feasibility of installing an automated meter reading system. The Council's expert witness stated that this expense neither benefited the customer nor was related to the test period under study—1972. We see no need to discuss the Commission's finding that the proposed expenditure was related to the betterment of customer service and greater employee productivity. Such a conclusion is warranted by the evidence.

The only issue for any extended discussion is the Commission's consideration of a cost factor that postdates the test year. When there is known and measurable change occurring after the test year which would affect with certainty the test-year data, the Commission may give effect thereto. *City of Pittsburgh* v. *Pennsylvania Public Util. Comm'n,* 187 Pa.Super. 341, 144 A.2d 648 (1958). Such an adjustment is a matter directed to the ratefixer's discretion. The record presented to the Commission showed post-test-year adjustment, whose effect on the test period

was known and measurable. Its use by the Commission was proper.

### Accrued Interest

During the hearing, the Council contended that one source of Narragansett's cash working capital[3] should be funds in excess of $2,000,000 which the utility plans to use to pay the interest on its long-term debt.

The source of cash working capital allowances is generally restricted to funds which are allocated for operation and maintenance expenses and taxes. It does not include capital costs. *See,* Bauer, *Updating Public Utility Regulation* 78-80 (1966). This court in *Rhode Island Consumers' Council* v. *Smith, supra,* made reference to the cash working capital aspect. There was no indication given in that prior opinion that we were adopting any definition of cash working capital other than the traditional one.

If the accrued long-term debt interest could be employed to supply working capital, it appears to us that it would be just as appropriate to employ other elements of capital costs, such as reserves for dividends and depreciation, for this purpose. The Council rebuts this last statement by maintaining that no cash working capital is needed for the payment of dividends since payment thereof is at the discretion of Narragansett. Such a reply is without merit. There is really no discretion involved. If preferred dividends were in default, control of the company would fall to these stockholders. In order for Narragansett to remain financially sound and be able to attract capital at reasonable rates, it must pay dividends quarterly. Also, the Council maintains that depreciation expense does not rep-

---

[3]Cash working capital ordinarily is the amount of cash required to operate a utility during the interim between rendition of service and the receipt of payment therefor. *Rhode Island Consumers' Council* v. *Smith,* 111 R. I. 271, 302 A.2d 757 (1973). The interim period is known in the industry as the "lag."

resent a cash disbursement in the year in which it is charged. Depreciation, however, is a major source of annual cash flow.

The facts control in each case. We believe that the determination of the amount that is needed to constitute a utility's working capital is directed to the Commission's sound discretion, and in the absence of an abuse of discretion, an allowance or disallowance of an amount as cash working capital will not be set aside. *See, Petrolane Gas Serv., Inc.* v. *Public Util. Comm'n,* 85 Idaho 593, 600, 382 P.2d 777, 781 (1963).

There is evidence to support the Commission's exclusion of the interest.

### Federal Income Tax Allowances

The Council complains that the Commission accepted without comment or discussion Narragansett's calculations as to its actual federal tax liability. It asserts that in at least two areas, one dealing with interest expense, and the other concerning taxes due municipalities, the Commission erred and that these errors resulted in a $680,000 overstatement of the utility's tax liability.

As we noted earlier, the Commission allocated as part of Narragansett's cost of service a sum for federal income taxes. The Council objects to the amount of this sum which is attributable to interest expense because of what it describes as an improper allocation of interest expense between "plant in service" and "construction work in progress." The amount of interest deduction in dispute is $280,000. The disputed municipal taxes were in the amount of $400,000.

We shall dispose of the municipal taxes by pointing out that at the hearing before the Commission the $400,000 adjustment was removed as an item of the cost of service and therefore was not included in Narragansett's calculations. Therefore, the issue is not viable.

It is a rudimentary principle that the only taxes allowed as operating expenses are those that the utility is required to pay and actually pays. *F. P. C.* v. *United States Gas Pipe Line Co.*, 386 U. S. 237, 87 S.Ct. 1003, 18 L.Ed.2d 18 (1967). The difference among the experts as to the inclusion of the $280,000 comes because Narragansett's expert applied a weighted cost rate of debt capital to the total rate base. The effect of this approach was to exclude from its computation the interest on the utility's short-term obligations which were issued to finance the construction work then in progress. Narragansett's rationale for this exclusion was its long-standing position that short-term debt is not a part of its permanent capital structure. Some substantiation for that position can be found. *See,* 1 Priest, ch. 5, *supra.* On the other hand, the Council's witness in his calculation considers all interest expenses as eligible deductions from taxable income.

Since the utility is allowed to capitalize allowances for funds earmarked for construction and thereby be allowed a depreciation factor on its federal income tax returns, this area should be a two-way street. The rate payer should also receive the benefit of lower charges by the utility's inclusion of the short-term interest expense. Just as the *United States Gas Pipe Line Co.* rule requires the inclusion of the taxes actually paid as operating expenses, so, too, should the interest paid on the short-term obligations be included within that category.

We see no reasonable basis for the Commission's exclusion of the $280,000.

We shall now consider the contentions espoused by Narragansett.

### Wage Adjustment

In its testimony, Narragansett adjusted its 1972 cost of service to reflect a 5.5 per cent increase in wages and salaries effective April 1, 1972 as if the increases had been in

effect for the full year—1972 being the test year. The Commission's adjustment represented "only the actual amount of the increases over actual 1972 wage and salary payments." Hence, the Commission disregarded the first three months of 1972 when computing this factor. Such action, so says Narragansett, was flagrantly arbitrary and clearly erroneous.

Narragansett contends that the failure to annualize the wage and salary increases for 1972, *i.e.*, determine a test year for the increase, upon which to base 1973 considerations, was arbitrary action on the part of the Commission and clear error.[4] We agree. The object of test-year figures is to reflect typical conditions. Since a test period is employed to show what the probable operating and financial condition of Narragansett will be in the immediate future, in order that rates may be fixed which will compensate the company for all operating expenses and provide it with a fair return, the test year must be representative of the conditions which will prevail in the immediate future when those rates will be effective. *Southern New England Tel. Co. v. Public Util. Comm'n*, 29 Conn.Supp. 253, 282 A.2d 915 (1970). We do not doubt that in order to arrive at an accurate calculation of expenses, the necessity of a test year is evident. On the record before us, we have only the Public Utilities Commission rejecting the annualization put forth by Narragansett and basing its decision as to the estimated operation expense, *i.e.*, the wage and salary adjustments on the actual payments made for the last nine months of 1972. We see such as error. A failure to consider the first quarter of 1972 presents a false picture with reference to the future expenses that Narragansett may incur. Therefore, we remand this

---

[4]There is some suggestion in the record that the annualized approach which we have embraced will increase the rate base by $200,000. However, this is a matter which the Commission can ascertain with certainty on remand.

matter to the Commission with a direction to allow a full amount of the wage and salary adjustment.[5]

### Prepaid Insurance Premiums

Narragansett challenges the Commission's decision to exclude from the rate base certain prepaid insurance premiums. The amount of these prepayments was $104,000. The policies in issue were of one to three years in duration and were paid for in full in advance rather than by installments.

Narragansett presented evidence to establish that it follows the practice of prepayments on the advice of its insurance department and its brokers. Three reasons were given for such a procedure. First, prepayment results in lower premiums for policies than when installment payments are used. Second, premiums on three-year policies remain fixed and are not subject to upward revision during the policy period. Finally, Narragansett is assured of coverage for the duration of the policies.

The Council contends that the utility made no showing before the Commission of the benefit of these prepayments to the ratepayer, and, therefore, that such expenses should not be included within the rate base. Also, the Commission had excluded these items from Narragansett's rate base in the previous rate proceeding. Docket No. 1076.

The Commission agreed with the Council and excluded the prepayments on the ground that such expenses are incurred at the election of Narragansett and that the utility had not sustained its burden of showing that benefit is gained by the ultimate consumer.

---

[5]We note that on the record before us the Council only objected to the offset for productivity being disallowed. It neither briefed nor argued the point of whether annualization of the expenses is the proper method for determining the test-year. Therefore, we infer consent on their part to this being the proper method for calculation and remand to the Commission for a determination of its affect in the computation of the rate base.

It is quite clear to this court that the practice adopted by the utility, which not only reduces the cost of insurance premiums but at the same time insures coverage over extended periods of time, benefits the ratepayer. The practice is a sound one financially. There is assured maximum protection to the utility, and, hence, indirectly to the ratepayer. It is the duty of a public utility to avail itself of such protection for the benefit of its customers, the public.

The Commission acted unreasonably and arbitrarily in failing to include such prepayments in the rate base. We find that the Commission's determination is not fairly and substantially supported by legal evidence, and, therefore, it becomes necessary for the agency to allow this sum as an element of the rate base.

### Cash Working Capital for Purchased Power

Before discussing this area, it is appropriate that we briefly set forth a relationship which could be called, for want of a better term, Narragansett's family tree. All Narragansett's common stock is owned by a holding company, the New England Electric System (New England Electric). New England Electric also owns the New England Power Service Company (New England Power). The interrelationship of Narragansett, New England Electric, and New England Power is such that the real profits, because of federal laws governing utility holding companies, are reflected on the books of the holding company, New England Electric, rather than on the books of the operating company, Narragansett, which of course is subject to the regulations of the Commission. Having in mind the arboreal theme of this paragraph, we may call New England Electric the trunk of the tree, two branches of which are Narragansett and New England Power.

On August 25, 1967, Narragansett entered into a contract with New England Power for the purchase of virtually all of its primary electricity, which Narragansett in turn sells

to its customers. The rates under the contract for the purchase of this power are regulated by the Federal Power Commission. Under the agreement, Narragansett is credited by New England Power for the full cost of whatever electricity which may be generated by the Rhode Island utility. New England Power bills Narragansett on a monthly basis in arrears for electricity it delivers to Rhode Island. The payment terms are that New England Power's bills "shall be due when rendered." However, Narragansett has a 60-day grace period for payment before it incurs an interest charge at the rate of seven per cent per annum on the unpaid balance.

Narragansett has included within its computation a cash working capital allowance for the purchase of power in the amount of $1,397,000. This amount represents the money needed to maintain Narragansett's operation during a lag period of 28.22 days which the utility claims is the time that elapses between the date it pays its bill to New England Power and the date it is reimbursed by its customers.

Despite Narragansett's assertion of a contractual obligation to pay New England Power's bills when rendered, the Commission refused to allow cash working capital for this expense. Narragansett maintains that in so rejecting the expenditure, the Commission acted arbitrarily and clearly abused its discretion.

It is evident that the Commission based its decision upon the fact that while the power bills are "due when rendered," they do not incur any interest charge until after 60 days. Evidence adduced at the hearing revealed that other subsidiaries of New England Electric do not pay their power bills to New England Power when they are rendered. The Commission had before it evidence establishing that power charges to Narragansett consequently contain a factor for working capital requirements which result from delays in payments to New England Power by the holding company's

other subsidiaries. It appears from the Commission's Report and Order that, although Narragansett and New England Power are separate corporate entities, the Commission believed that their relationship to New England Electric wholly as subsidiaries is such that they operate in fact as two divisions of the holding company.

The allowance for cash working capital as an item in the rate base is primarily to take care of the needs of current expenses over the period of "lag." Such allowance in the rate base, however, is not something to which a public utility is ipso facto entitled. *City of Pittsburg* v. *Pennsylvania Public Util. Comm'n,* 169 Pa.Super. 400, 82 A.2d 515 (1951). The sum necessary for working capital is addressed to the sound discretion of the utilities commission. *Petrolane Gas Serv., Inc.* v. *Public Util. Comm'n, supra.* The determination of the amount to be allowed as cash working capital is a question of fact, varying with the circumstances of each case. *Central Maine Power Co.* v. *Public Util. Comm'n,* 156 Me. 295, 163 A.2d 762 (1960).

In reviewing the testimony before it, the Commission, in disallowing the purchased power element, has merely determined the factual question against Narragansett. Since there was the 60-day grace period, the Commission felt the sum requested was not one "* * * which the company needs to supply from its own funds for the purpose of enabling it to meet its current obligations as they arise." *Alabama-Tennessee Nat. Gas Co.* v. *F. P. C.,* 203 F.2d 494 (3d Cir. 1953).

It appears to us that the ultimate consumer should not be penalized in the form of higher rates if Narragansett chooses to pay its charges before they start to incur interest, especially when the other members of the family tree do not pay their power bills when due.

Narragansett maintains that the Commission's ruling is "requiring Narragansett's management to be less than pru-

dent." We do not join in that conclusion. The Commission is merely requiring the utility to exercise the kind of prudent money management the ratepayer has a right to expect from a regulated monoply. We see no abuse of the Commission's discretion.

## Conclusion

In the Council's case, its petition for certiorari, insofar as it relates to the Commission's decision on the investment tax credit, the employee productivity factor, the research and development expenses, and the accrued interest on the utility's long-term debt, is denied and dismissed; the petition as it relates to the $280,000 tax on the utility's short-term debt is granted, and that portion of the Commission's decision is quashed.

In Narragansett's case, its petition for certiorari, insofar as it relates to the Commission's failures to annualize the wage and salary expenses and to include the prepaid insurance premiums, is granted, and those portions of the Commission's decision are quashed; the petition as it relates to the cash working capital allowance established by the Commission is denied and dismissed.

The records certified to us are to be returned to the Commission with our decision endorsed thereon, and with a direction that the Commission make further findings consistent with this opinion.

Mr. Chief Justice Roberts did not participate.

*Roberts & Willey Incorporated, Dennis J. Roberts II, Bruce G. Tucker,* for Rhode Island Consumers' Council.

*Edwards & Angell, Edward F. Hindle, Knight Edwards, Deming E. Sherman,* for The Narragansett Electric Company.

*Archie Smith,* pro se, for respondent.