376 A.2d 687

PROVIDENCE GAS COMPANY *vs.* EDWARD BURMAN *et al. and Members of the Public Utilities Commission.*
RHODE ISLAND CONSUMERS' COUNCIL *vs.* WILLIAM W. HARSCH, *Chairman of the Public Utilities Commission, et al.*

AUGUST 2, 1977.

PRESENT: Bevilacqua, C.J., Paolino, Joslin, Kelleher and Doris, JJ.

80

KELLEHER, J.    In mid-June 1975, the Providence Gas Company (the company) filed a revised schedule of tariffs with the Public Utilities Commission (the commission) which was designed to increase the company's annual revenues by an additional $6.3 million. The commission, acting pursuant to G.L. 1956 (1969 Reenactment) §39-3-11, as amended by P.L. 1969, ch. 240, §5, suspended the proposed effective date of the new schedule and thereafter held a series of hearings on the company's proposal. The hearings began on October 22, 1975 and ended in mid-January 1976. The commission heard the testimony of several witnesses, some of whom appeared on behalf of the company, others were presented by the Division of Public Utilities (the division), and one who testified at the request of the Rhode Island Consumers' Council (the council). As the hearings neared their conclusion, the commission determined that the company's steadily deteriorating financial condition

made it mandatory that whatever rate relief was to be granted should be awarded at the earliest possible time. Consequently, on February 13, 1976, the commission entered an order which rejected the company's proposal but authorized the filing of a revised schedule, which would increase the company's annual revenue by approximately $2.8 million. This order contained a proviso which stated that the commission's full report and order would be filed on February 23, 1976. A report and order detailing the factual and legal conclusions for the commission's February 13 order was filed on February 23.

The company and the council then filed with us a variety of petitions for certiorari. The petitions, which we have consolidated in this proceeding, raise issues that relate to the timeliness of the appeal taken by the council, the commission's findings as to a proper rate base and rate of return, and the role played by the Attorney General's Department during the administrative phase of this contoversy.

## I. *The Timeliness of the Council's Appeal*

The commission's February 13 order contained a stipulation which stated that for the purposes of claiming an appeal the order should be considered as being entered as of February 23, the day upon which the decision was to be filed. Section 39-5-1, as amended, provides that the "exclusive" vehicle for seeking judicial review of any decision or order of the commission shall be a petition for certiorari to this court, which is to be filed within 7 days from the date of such decision or order. The bifurcated approach taken by the commission casts a cloud of uncertainty as to when the 7-day appeal period begins to run.

The company filed two statutory petitions for certiorari, one filed February 20 and the other on March 1. The council took a somewhat different tack. On February 27 it filed two petitions. One was a statutory petition for certiorari, and the other was a petition asking that we issue our common law writ of certiorari.

The company, in seeking to excise the council's appeal from this controversy, claims that the commission had no power to provide in its February 13 order for the postponing of the 7-day appeal period until February 23. Thus, the company reasons that the February 13 order triggered §39-5-1's 7-day period, and as a result the council's February 27 statutory petition was filed out of time. The company also argues that since the General Assembly has described §39-5-1 as the "exclusive" appellate remedy, the council's common law petition must also go by the boards because of the oft-cited proposition that this court will not issue common law certiorari where the petitioner has failed to utilize another available adequate remedy. As will be seen, there is no necessity that we consider the commission's power to postpone the running of §39-5-1 or the availability of common law certiorari in the circumstances presented by this record.[1]

Assuming arguendo that the February 13 order triggered the appeal statute, the fact remains that the commission reissued that order on February 23 by incorporating it within its report and decision of that date. Section 39-5-1 by its terms applies to any "decision or order" of the commission, and the February 23 document constitutes just such a decision or order. Consequently, the council's February 27 statutory petition was timely filed, and its objections to the findings made by the commission are properly before us.

## II. *Rate Base*

A utility's rate base represents the total investment in or the fair value of the used or useful property which it necessarily devotes to the rendering of the regulated service; usually the largest item in a utility's rate base is its investment in plant. This investment is valued either by averaging

---

[1] We have on a previous occasion issued common law certiorari to review the commission's action. *Rhode Island Consumers' Council v. Smith*, 113 R.I. 384, 387, 322 A.2d 17, 19 (1974).

it at the beginning and at the end of the test year[2] or by determining the value as of the end of the test period. *Rhode Island Consumers' Council* v. *Smith,* 111 R.I. 271, 286, 302 A.2d 757, 767 (1973).

The company, in measuring the value of its rate base, claimed it was worth about $49.9 million. However, the commission set a value of this item at approximately $45.5 million, and the council proposes a further reduction in the commission's valuation of another $1.2 million.

As noted earlier, there is a difference of opinion as to the formula that should be utilized in computing a company's investment in its plant. In considering this facet of the controversy, one should be aware that there is not only a difference of opinion as to the formula that should be utilized in computing the company's investment in its plant, but also as to what items are properly included in the rate base.

### A. Average or end-of-the-period rate base

In considering the company's application for a rate increase, the commission has continued to adhere to its recent practice of establishing the rate base by the averaging system rather than measuring value as of the end of the test period. The company finds no fault with the averaging approach so long as the utility has experienced a period of growth. It points out that during a growth economy, a utility is constantly expanding its capital assets in order to serve new customers. Accordingly, its rate base is greater at the end of the test period than at the beginning, and the utility's revenue-producing capacity is not fully reflected during the test period because the additional plant was not in use throughout the period. Consequently, the company concedes that the averaging techniques must be used if one is to obtain a meaningful match between the test period

---

[2]A determination which must be made in any rate case is the selection of an appropriate test period during which the utility's revenues, expenses, rate base, and rate of return may be measured. The test period is usually a 12-month period. The test period used by the company in this proceeding was the year 1974.

revenues and the capital assets that will produce that revenue. Having acknowledged that the averaging approach has a place in the ratemaking process, the company now asserts that it should not be employed in this particular proceeding because the company is not experiencing anything close to a growth spurt. According to the company, it cannot expand because its gas supplies have been curtailed, and any additions to plant have been made solely for the purpose of replacing wornout equipment so that the status quo can be maintained so far as its present services and revenues are concerned. After painting such a dismal picture, the company concludes that its stagnant status bars the use of averaging because any increase in the value of its capital assets in no way reflects any increase in its income producing capacity. In such circumstances, it contends, the rationale for using an average test period rate base simply vanishes into thin air.

The commission, on the other hand, takes the position that the use of the averaging technique is necessary to avoid over-stating the amount of plant actually used and useful during the test period. The commission also observed that the use of the end-of-the-period technique would force the ratepayer to contribute what amounts to a full test period of support for a plant that was actually in service for only part of that period.

In its simplest form, the company's argument boils down to one of attrition.[3] The problem is not a novel one before this court. *New England Tel. & Tel. Co.* v. *Public Util.*

---

[3]Attrition has been defined as "the term applied to the reduction in the rate of earnings resulting from additions to plant at costs higher than the value of similar items in the rate base, so that the relation between rate base and rate of return deteriorates. In other words, attrition — the decline in the rate of return earned — results when the rate base expands faster than the revenue and is caused both by inflation and by expansionistic construction programs which do not generate additional comparable revenue." *Public Serv. Comm'n* v. *Baltimore Gase & Elec. Co.*, _____ 273 Md. 357, 364 n.3, 329 A.2d 691, 696 n.3 (1974). Interestingly, in the *Baltimore Gas* case the court upheld the end-of-year figure to account for the attrition factor.

*Comm'n,* 116 R.I. 356, 358 A.2d 1 (1976); *Rhode Island Consumers' Council* v. *Smith,* 111 R.I. 271, 302 A.2d 757 (1973). Nor is our answer. The commission is not bound to utilize one formula over another in determining the proper rate base for the company. The attrition factor would be remedied by various adjustments the commission could make to the rate base, the rate of return, or both. *Id.* at 279-80, 302 A.2d at 763-64. Here the only concern of this court is whether the measurement approach employed by the commission is just and reasonable. If so, our inquiry is at an end. We cannot fault the commission for its use of the averaging rather than the end-of-the-period technique in determining the company's rate base.

Having made this observation, we would add but one comment. The company has argued that some $160,000 representing construction work in progress (CWIP) at the end of the test year should have been included within the rate base. The commission properly excluded this amount, as it did not represent used and useful property that was presently being devoted to providing the regulated service. *New England Tel. & Tel. Co.* v. *Public Util. Comm'n, supra* at 387, 358 A.2d at 19.

### B.   *Cash working capital*

Cash working capital is the amount of money needed by the company to pay its bills between the period it renders services to and collected payment therefor from the customer.[4] This interim period between rendition of services and payment therefor is known as a "lag." *Rhode Island Consumers' Council* v. *Smith,* 111 R.I. at 288-89, 302 A.2d at 768. On the other hand, those revenues collected prior to the time the company must make payments

---

[4]The reason for including this figure in the rate base is that investors (stockholders) during this lag as a matter of course pay the expenses that should be borne by the customer. Accordingly, they should be allowed a return on that property they temporarily lend to the company for the delivery of the regulated service. *See* 1 Priest, *Principles of Public Utility Regulation* 186-87 (1969).

are called "leads."[5] A matching of "leads" and "lags" results in a figure representing the amount of cash working capital required by the company.

In the instant case, the division employed Lazarus S. Donabedian, a financial analyst, to conduct a lead-lag study. His results showed a *negative* cash working capital requirement of about $824,000, i.e., the company had more than enough customer money to pay its bills as they fell due.[6] The company, however, claimed it needed a cash working capital allowance of $2,364,334. It based its computation on the "45-day rule of thumb" and a limited lead-lag study of its purchases of gas.[7]

Recognizing our rule that "[t]he determination of the amount to be allowed as cash working capital is a question of fact, varying with the circumstances of each case," *Rhode Island Consumers' Council* v. *Smith*, 113 R.I. 384, 401, 322 A.2d 17, 26 (1974), *citing Central Maine Power Co.* v. *Public Util. Comm'n*, 156 Me. 295, 163 A.2d 762 (1960), the company nonetheless considers the analyst's study to be worthless and asserts that, in the absence of any other competent study, its figures should be adopted. The company's challenge to the study concerns an exclusion from the computations of undercollections associated with

---

[5]Leads may be realized in various situations other than actual payment for services by the customer. For example, there will be a lead time for payrolls of company employees — they will render services to the company prior to the time they are paid therefor. The cash the company has on hand during this lead period is "working capital." These leads are offset against the lags to arrive at an amount of money required to run the company on a day-to-day basis.

[6]Using a 45.4-day lag period, he found the amount of expenses represented by that lag to amount to $4,476,939. Offsetting that amount by his various lead computations, he arrived at his negative figure.

[7]The 45-day rule simply deems working capital requirements to be one-eighth of the test year operating expenses. Although adopted by many jurisdictions, this methodology has been specifically rejected by this court in numerous cases. *New England Tel. & Tel. Co.* v. *Public Util. Comm'n*, 116 R.I. 356, 385, 358 A.2d 1, 18-19 (1976); *Rhode Island Consumers' Council* v. *Smith*, 113 R.I. 384, 401, 322 A.2d 17, 26.

the purchase gas adjustment clauses (PGA). Again, in accordance with our rule of review, all we need direct our attention to is the commission's treatment of this factor and the reasonableness of its findings. *Rhode Island Consumers' Council* v. *Smith*, 111 R.I. at 277, 302 A.2d at 762.

The PGA is comprised of two parts. Part 1 deals with the purchase of synthetic natural gas (SNG) by the company. The clause permits an automatic rate increase to reflect the increased purchase price of SNG. SNG is purchased during the heating season over a 5-month period (November -March), but the collection of revenues associated with this part of PGA is spread over a 12-month period. This results in substantial lags. Moreover, the undercollection associated with this expense in 1974 amounted to some $1.9 million.

Part 2 of the PGA deals with other fuels with which the company supplements the supply of natural gas which it receives via the pipeline. The company estimates the amount it will have to spend for this supplemental fuel and designs a rate to collect that amount. Such a procedure may result in an over- or undercollection for the year depending upon the accuracy of the company's estimate. Ostensibly, when the company realizes an overcollection for a given year, it credits the reserve to the ratepayer by decreasing its next year's estimate of part 2 costs in proportion to any over-collection. (Its estimates would proportionately increase in the event of an undercollection in the prior year.)

The company, however, overestimated its costs in 1973 and 1974 due to mild winters. This resulted in overcollections. Moreover, the company as a result of an "accounting problem" failed to credit its 1973 overcollections to its 1974 estimates. The result was a $708,994 overcollection as of December 31, 1974. The company contends, however, that this overcollection will not be recurring, whereas the lag associated with SNG purchases will.

The commission, in giving the company a zero cash work-

ing capital allowance, makes the following comment about the PGA problem:

"There are two additional items which impact upon the working capital requirements of the Company. These are the over- and undercollections of the two purchased gas adjustment (PGA) clauses. Mr. Donabedian suggested that these might be recognized, although he stated they would not be a part of his lead-lag study. The Commission has not included these amounts in the working capital analysis for two reasons. First, the undercollection under part one of the PGA, for which there is a lag, very nearly matches the overcollection under part two, for which there would be a lead. In addition, Mr. Donabedian's analysis shows a net negative cash working capital requirement. In allowing Providence a zero component for working capital in a rate base, we are essentially building in a cushion for the Company of approximately $800,000. To the extent there is a mismatch between the lead and lag associated with the PGA, it is absorbed by this cushion."

It appears to us that the "overcollections" and "undercollections" attributable to the PGA are proper factors to be considered in a lead-lag study by definition.[8] We are dubious about its comment that the lag associated with undercollections very nearly matches the lead associated with the overcollections. Even given that the total overcollection of $700,000 is properly included, we fail to see how this lead matches a $1.9 million undercollection lag. Secondly, although the $800,000 "cushion"[9] to which the commission refers in its report and order would seemingly

---

[8]Even Mr. Donabedian conceded that, in the proper case, although he would not include these items in a lead-lag study, they should be reflected in some other facet of the rate base. We do not see any other treatment of these factors by the commission in the rate base.

[9]The $800,000 cushion is the negative figure computed by the analyst.

offset the lag to some degree, no one has directed our attention to any portion of the record that would justify a conclusion of a total offset.

In such circumstances, we shall neither search the record for evidence warranting such a conclusion nor make an independent determination of the properly allowable cash working capital figure. Such a factfinding determination rests with the commission. *Rhode Island Consumers' Council* v. *Smith,* 111 R.I. at 289, 302 A.2d at 769; *United Transit Co.,* v. *Nunes,* 99 R.I. 501, 209 A.2d 215 (1965); *New England Tel. & Tel. Co.* v. *Kennelly,* 81 R.I. 1, 98 A.2d 835 (1953).

We, therefore, remand this issue to the commission for clarification.

## C. *Newport acquisition*

In December of 1974, the company purchased the net assets of the Newport Gas Light Company (Newport). It paid $1.2 million less than the present book value of the company at the time of acquisition.[10] The company sought to include the property in its rate base at book value rather than the purchase price. The council, on the other hand, insists that the Newport acquisition should not be included in the rate base at more than the purchase price — the "original cost" to the company. The council recommends that the purchase price be included within the rate base computation but that the annual depreciation charge relating to this property be based upon its book value. The commission, on its part, adopted a middle ground. It allowed the book value of Newport to be included within the rate base, but acknowledged its duty to the consumer by amortizing the difference between book value and purchase price ($1.2 million) over a 24-year period. The amortization

---

[10]We have previously considered the effect of the company's takeover of Newport on Newport's then pending application for a rate increase. *Providence Gas Co.* v. *Public Util. Comm'n,* 116 R.I. 80, 352 A.2d 630 (1976).

would be an additional revenue to the company resulting in an annual cost of service adjustment of $50,000 in favor of the consumer.

The council cites numerous cases to us which hold that when acquisition cost is less than the book value of the acquired utility, the only properly includable figure for rate base is the purchase price. This rule, however, follows from those jurisdictions which adhere strictly to "original cost" valuation of assets. *See e.g.*, *Re Vermont Gas Systems, Inc.*, 100 P.U.R.3d 202 (Vt. P.S. Bd. 1973). In Rhode Island the commission is bound by no hard and fast rule to determine the fair value of the property devoted to rendering the regulated service. "That is a holding that the fair value of the property is the rate base but it is not a rule prescribing how such value shall be determined." *Narragansett Elec. Co.* v. *Kennelly*, 88 R.I. 56, 69, 143 A.2d 709, 717 (1958). Particularly reflective of this approach, and analogous to the case before us, is *Town of Jamestown* v. *Kennelly*, 81 R.I. 177, 100 A.2d 649 (1953). In that case the administator refused to include the purchase price of a utility as its fair value for the rate base, opting for the higher price. The court, in upholding his determination, noted: "The actual price paid may or may not have represented the fair value of the property. It is a relevant fact but not an exclusive or final test of such value. * * * The administrator was not bound to adopt such adjustment (purchase price) if there was evidence which justified findings to the contrary." *Id.* at 181, 100 A.2d at 651.

Such is the case before us. On a review of the record the commission was justified in finding the purchase price not to be reflective of the fair value of the assets. We find both the valuation of the asset and the amortization of the acquisition adjustment to be reasonable and, accordingly, we will not interfere with the commission's treatment of this issue.

## III. · Rate of Return

The rate of return is the percentage by which the rate base is multiplied to provide a figure that allows a utility to collect revenues sufficient to pay operating expenses and attract investment. *Rhode Island Consumers' Council* v. *Smith*, 111 R.I. 271, 302 A.2d 757 (1973). That rate of return adopted by the commission must be measured against the yardstick of reasonableness as articulated in the *Hope*[11] and *Bluefield*[12] decisions and adopted by this court in *Narragansett Elec. Co.* v. *Kennelly, supra.* The thrust of these decisions provides that a utility should be allowed a rate of return commensurate with that allowed enterprises engaged in similar activities with similar risks in the same general area. Specifically, the return allowed should be sufficient to attract new capital investment and adequately compensate present investors while insuring that the public interest is adequately protected. With these general guidelines in mind, we shall proceed to the specific findings of the commission.

In its report and order the commission found the composite cost of capital (rate of return) to be 9.7% on the following basis:

### PROVIDENCE GAS COMPANY
### COST OF CAPITAL

| Type of Capital | Amount (Thousands) | Capital Structure | Cost Rate | Weighted Cost |
|---|---|---|---|---|
| Long-Term Debt | $23,884 | 50.3% | 7.21% | 3.63% |
| Short-Term Debt | 3,350 | 7.1% | 7.5% | .53% |
| Common Equity | 20,215 | 42.6% | 13.0% | 5.54% |
| Total | $47,449 | | | 9.70% |

---

[11]*FPC* v. *Hope Natural Gas Co.*, 320 U.S. 591, 64 S. Ct. 281, 88 L. Ed. 33 (1944).

[12]*Bluefield Water Works & Imp. Co.* v. *Public Serv. Comm'n*, 262 U.S. 679, 43 S. Ct. 675, 67 L. Ed. 1176 (1923).

As is usually the case, there was little disagreement between the experts regarding the debt-equity ratios (capital structure) of the return rate required to compensate for embedded costs (long- and short-term debt) of the company. The bone of contention, again, is the proper return to be accorded common equity and its corresponding proportionate effect on the composite cost of capital. We find it unnecessary to cite authority for the observation that the cost of equity is the single most difficult and speculative area in the determination of a proper rate of return. Having made this observation, however, we reiterate that the rate of return as established by the commission is presumptively reasonable "and will not be interfered with unless the company, in asserting the contrary, satisfies us by clear and convincing evidence that it is clearly, palpably and grossly unreasonable." *Rhode Island Consumers' Council* v. *Smith*, 111 R.I. at 295, 302 A.2d at 772.

## A. *Cost of equity*

The testimony concerning the proper cost of equity came from two witnesses: Albert C. Bellis for the company and John W. Wilson for the commission. Mr. Bellis testified that the minimum proper return on equity for the company was 15 percent. He maintained that 6 percent of his estimated rate of return would be used to meet projected construction costs as well as maintain the company's existing debt-equity ratio. The other 9 percent, he said, would be paid out as dividends. Bellis attempted to support his recommended rate of return by showing an average rate of return on the market price for similarly situated companies to be 15.4 percent.

Mr. Wilson, on the other hand, testified that the proper cost of equity was 12 percent. Wilson based his conclusion upon a comparable earnings analysis and a discounted cash flow analysis (DCF). Wilson's comparable earnings study evidenced a rate of return of 11.9 percent for comparable companies, and a 10.9 percent return for comparable companies located within the north-eastern United States.

The DCF is an investor-oriented method that determines a utility's required return on equity. The formula and mathematics involved are no less "complex and abstruse" than they were in *Rhode Island Consumers' Council* v. *Smith*, 111 R.I. at 295, 302 A.2d at 771. However, the commission as sole factfinder was free to credit or discredit Wilson's analysis as it deemed proper. After applying the DCF, Wilson arrived at a proper rate of return for the company of 12 percent with the "zone of reasonableness" being between 10 and 12 percent.

The commission rejected Bellis' rate of return analysis for the reason, among others, that it found his 6 percent requirement for retained earnings overly speculative. However, in adopting Wilson's testimony for establishing the rate of return, it added an additional 1 percent to the high-level mark, 12 percent, of his zone of reasonableness. The commission, in justification of its addition, noted: "The exigencies of the natural gas distribution industry in general, and of Providence Gas in particular, at this time, warrant a return higher than 12 percent. In our judgment a fair and reasonable return, equitable both to Providence's stockholders and consumers, is 13 percent." The company and the council both attack the commission's finding.

The company asserts such a rate is confiscatory and in support of this contention it directs our attention to *New England Tel. & Tel. Co.* v. *Department of Pub. Util.*, 371 Mass. 67, 76, 354 N.E. 2d 860, 867 (1976), where the court observed: "If new stock yields net proceeds less than book value, the equity of existing stockholders is diluted; and forced dilution is confiscation, at least in the absence of some explanation not present in this case."[13]

---

[13]This argument is basically a restatement of the necessity to protect the interest of a "captive" shareholder in the company when determining the cost of equity. As Priest notes, one of the factors to be weighed in determining a proper rate of return on equity is "fairness to existing or 'captive' stockholders obviously concerned about the possible dilution of dividends and values per share." 1 Priest, *Principles of Public Utility Regulation* 209-10 (1969).

The company reasons that to maintain its present book value of stock, $16 a share, a new issuance of common stock would necessitate an allowable 15 percent rate of return — an "average" rate of return which the company maintains today's investor demands. Any lesser rate of return, asserts the company, would drive down the market price of stock to a level where the hypothetical investor could achieve that 15 percent rate of return. Thus, the lowered price the company receives for the stock would dilute the existing book value of the stock to present shareholders. Such "forced" dilution, contends the company, would be confiscatory. The company also argues that even in the event no new stock is issued, present shareholders should be treated no differently than the outside investors, who expect a 15 percent rate of return. The ready response to this last contention is that in the absence of a new stock issue there would be no dilution of book value.

The problem with the company's argument as to the issuance of new stock is that it is unsupported by facts. To begin with, the Massachusetts case did not base its finding on the premise of an average rate of return or market price. On the contrary, the court admonished that the proper rate of return was "a 'matter of judgment,' not 'an immutable number,' " *New England Tel. & Tel. Co.* v. *Department of Pub. Util., supra* at 76, 354 N.E. 2d at 866, *citing New England Tel. & Tel. Co.* v. *Department of Pub. Util.*, 360 Mass. 443, 472-74, 275 N.E.2d 493, 511 (1971). The variance in the market rate of return in Bellis' own sample group, which ranges from 10 to 20 percent, supports the court's observation. Moreover, the holding of the Massachusetts Supreme Judicial Court was based on a showing of an actual dilution of equity resulting from a new stock issuance after the Massachusetts PUC had set the rate of return. Such is not the case before us. There is no guarantee here that a 10 to 13 percent rate of return based upon accepted principles of rate determination would not provide an attractive investment possibility to the market communi-

ty. Moreover, we are disinclined to have the consumer shoulder the brunt of potentially erroneous speculation.

Lastly, we wish to point out that there is no assurance that any allowable rate of return will insure that the market price of a new issuance of stock will equal that of book. Thus, the mere fact that equity is diluted as a result of such sale does not lead to a conclusion that the rate of return is confiscatory. The Massachusetts court recognized this limitation by remarking: "* * * forced dilution is confiscation, at least in the absence of some explanation not present in this case." *New England Tel, & Tel. Co.* v. *Department of Pub. Util., supra* at 76, 354 N.E. 2d at 867. We need not engage in speculating what other factors would account for that "some other" explanation. However, at least one other court has found that there are factors other than the rate base, such as the price of new issue or the extent to which the utility is subject to regulation by various governmental agencies and economic policies, which will account for a disparity between book and market value. *Mountain States Tel. & Tel. Co.* v. *Public Util. Comm'n,* 186 Colo. 260, 268, 527 P.2d 524, 528 (1974).

We have examined the company's objections to the commission's adoption of Wilson's DCF method and find them to be totally unpersuasive.

The council, on its part, argues that the proper rate of return should be 11 percent. It asserts this to be an appropriate return in light of "management deficiencies" for which the company should be penalized. The cases to which the council directs our attention are inapposite. Although a commission *may* properly penalize a utility where its service or management has been inadequate, there was no such finding nor order by the commission in the instant case. Again, we shall not usurp the commission's role as sole fact-finder.

The council's other argument has merit. The council con-

tends that the addition of 1 percent by the commission to Wilson's 12 percent rate of return was error. It is clear that the commission's findings, though entitled to great weight, must be supported by record evidence. Whether or not the commission's comment about "[t]he exigencies of the natural gas distribution industry" constitutes such a finding need not concern us here in light of the necessity for a remand concerning the attrition issue.

Counsel for the commission asserted at oral argument that the 1 percent increase was to compensate for the attrition factor, to which we have previously alluded. The commission's order, however, does not bear out this point. Conceivably, the "exigencies" to which the commission alludes may be something other than the attrition problem with which the company is seemingly faced. Accordingly, on remand the commission can clarify and substantiate its award of the additional 1 percent and enlighten us as to whether or not this particular increase is its answer to the attrition problem. If the 1 percent does represent an attrition allowance, the company will have the opportunity to present evidence to refute or support the accuracy of the commission's original prognostication, and the commission, if it deems it necessary, may update its computation. *Accord, New England Tel. & Tel. Co. v. Public Util. Comm'n.* No. 75-195-M.P. (R.I., filed July 12, 1977). Therefore, we remand this portion of the case to it for further action.

## IV.   *Test Year Expenses and Revenues*

This step in a rate determination matches expenses against revenues "in order to arrive at the amount of income available to pay the wages of capital, i.e. interest on debt securities, dividends on stock and additions to surplus." *Rhode Island Consumers' Council v. Smith,* 111 R.I. at 281, 302 A.2d at 764. The council and the company assert various objections to the commission's treatment of certain

expense and revenue items. Additionally, the council questions the admissibility of certain evidence presented by the company during this phase of the rate proceeding. We shall consider the arguments seriatim.

### A. *Did the commission properly disallow lobbying fees and charitable contributions incurred by the company?*

The company contends that the commission erred in refusing to allow some $26,000 worth of charitable contributions and $11,000 of lobbying expenses to be included as an "above-the-line" operating expense of the company (cost of service).[14] The issue has led to disparate results in different jurisdictions, although many still allow the inclusion of such items subject to reasonable restraints. See, Annot., 59 A.L.R.3d 941 (1974); 1 Priest, *supra* at 83-87. However, in *United Transit Co.* v. *Nunes*, 99 R.I. 501, 209 A.2d 215 (1965), this court held "that a gift by a public utility to a charitable organization in modest amount may be charged as an operating expense provided it is first established that it is productive of good community relations which will benefit the utility or its patrons." *Id.* at 513-14, 209 A.2d at 222.

On its part, the commission states that such expenses must be treated "below-the-line" and consequently excluded as a cost of service. The commission based its ruling upon certain statements found in a publication called the *Uniform System of Accounts* where it deals with lobbying and charitable expenses in an account of "Miscellaneous Income Deductions."[15] We do not agree with this position.

---

[14]"Operating,"or above-the-line expenses, are borne by the ratepayer. "Income deductions," or below-the-line expenses, are borne by shareholders of the company.

[15]We assume that the commission, acting pursuant to the provisions of the Administrative Procedures Act, G.L. 1956 (1969 Reenactment) §§42-35-1 et seq., has adopted the principles set forth in the *Uniform System of Accounts.*

The New York Public Service Commission has discussed the impact of the *Uniform System of Accounts* upon the ratemaking treatment of particular items within the "Miscellaneous Income Deductions" account. *Re Accounting Treatment for Donations, Dues, and Lobbying Expenditures,* 71 P.U.R.3d 440 (N.Y.P.S.C. 1968). The New York commission emphasized that while the publication was concerned with harmonizing accounting and ratemaking techniques, no accounting procedure, in and of itself, could bind the commission in fixing rates.

> "As pointed out previously, if for any reason a company feels that such an expenditure should be allowed in considering rates, it should sustain the burden of proving the reasonableness of that claim in the context of the commission's ratemaking procedures." *Re Accounting Treatment for Donations, Dues, and Lobbying Expenditures, supra* at 445.

Obviously, then, the existence of any particular accounting system does not automatically dictate the treatment of expense items for ratemaking purposes. Although for accounting purposes the commission can require such items to be put in the income deduction account, at the rate hearing the company should be given an opportunity to show such items benefit the ratepayer and, accordingly, should be treated as an operating expense.

This position is clearly applicable to charitable contributions in our jurisdiction. *United Transit Co.* v. *Nunes, supra.* Furthermore, we see no reason to treat lobbying expenses differently if the company can show the expense is reasonable and the purpose directly beneficial to the ratepayer. We, therefore, remand this issue to the commission in order to allow the company an opportunity to make a showing that these various expenses should be included in cost of service.

B. *Was the commission's treatment of the gain on a sale of utility property proper?*

In 1973 the company sold certain utility property to Algonquin Gas Transmission Company. The sale resulted in a $528,855 gain to the company. In a 1973 rate proceeding the company treated the gain as a below-the-line item. In the instant proceeding, the commission recognized the inequity of such treatment and ordered the company to amortize the gain above-the-line over a 24-year period. Such treatment would reduce the cost of service to the consumer by $22,000 annually.

The company does not seriously contend that such a gain should be treated as below-the-line income. However, it does maintain that the transaction was part and parcel of an earlier rate case, is not part of the present test period, was tacitly approved by the previous case, and, accordingly, should not be considered by the commission in the instant case.

In *FPC* v. *Hope Natural Gas Co.*, 320 U.S. 591, 64 S. Ct. 281, 88 L. Ed. 333 (1944), the Supreme Court noted: "The rate-making process under the Act, i.e., the fixing of 'just and reasonable' rates, involves a balancing of the investor and the consumer interests * * *. Nor is it important to this case to determine the various permissible ways in which any rate base on which the return is computed might be arrived at. For we are of the view that the end result in this case cannot be condemned under the Act as unjust and unreasonable from the investor or company viewpoint." *Id.* at 603, 64 S. Ct. at 288, 88 L. Ed. at 345. With these guidelines in mind, we find the commission's treatment of this item eminently reasonable and conducive to a fair end result. To decide otherwise would elevate procedure over substance at the expense of the consumer interest. Moreover, the company presented no evidence that the propriety

of including the gain below the line was even mentioned at the prior proceeding. All in all, we have no hesitancy in upholding the commission's present treatment of the gain.

C. *Did the commission make a proper adjustment for the undercollections associated with the purchase of SNG?*

The mechanics behind the operation of the two PGA clauses have been discussed earlier under the heading of *Cash Working Capital* and do not merit repetition here. The sole issue at this juncture is whether the commission properly treated the $1.9 million undercollection associated with the SMG portion of the PGA. Normally, undercollections of a given test year will be treated as revenues to the company in computing its cost of service. The council recommended that the entire sum of undercollections be reflected as such in the computation. The commission, however, adopted the company's argument that at least part of the undercollections attributable to SNG were recurring costs (i.e. a continual undercollection) rather than a deferred cost that would be recouped.

On that basis the commission determined the average undercollection over a 3-year period (the period since the company began using SNG) to be $1.1 million. Accordingly, it only included the "excess" undercollection, $798,539, as test year revenues. The council vehemently objects to this position as sheer speculation. The commission, while recognizing the potential inaccuracy of the estimate and the consequences thereof,[16] allowed the adjustment because the commission "will have ample opportunity to investigate and analyze the operation of the clause in the future."

To the extent that the company suffers a recurring under-recovery for SNG, we concur with the commission's treat-

---

[16]Should the company experience undercollections less than the average under-collection for SNG, it would amount to a net overrecovery in future years.

ment of it. However, given the commission's own hesitancy regarding the reliability of its prediction, this appears an appropriate situation to remand the cause and let the commission measure the accuracy of its estimate against the reality of the company's subsequent operating history. *Narragansett Elec. Co.* v. *Harsch*, 117 R.I. 395, 368 A.2d 1194 (1977); *Rhode Island Consumers' Council* v. *Smith*, 111 R.I. at 298, 302 A.2d at 773.

### D.   *The burden of proof*

The council contends that the company failed to meet its burden of proof under §39-3-12 to establish the necessity of a rate increase. Specifically, the council charges that the company failed to adduce competent evidence to support its proposal figures relating to rate base and cost of service. The pertinent facts in this regard may be briefly summarized.

The company introduced the testimony of Herbert W. Steere, Assistant Treasurer of the Providence Gas Company. Steere presented exhibits before the commission concerning the financial adjustments resulting from the use of various ratemaking principles. During the course of his testimony, it was disclosed that Steere was almost totally unfamiliar with the various principles to which he applied his figures. Later in the hearings, a rate analyst for the company supported certain adjustments to test year results included in Steere's exhibits. Finally, the company produced an expert in ratemaking principles, who "concurred" in what the exhibits purported to represent and supported the utilization of the ratemaking principles upon which Steere's figures were based.

The council moved to strike Steere's testimony on the grounds that he did not possess the requisite expertise and accordingly his exhibits were meaningless. Furthermore, on appeal it argues that Steere's testimony 'cannot be retroac-

tively validated by the experts who subsequently testified. Lastly, the council argues that even if the testimony given by the expert in ratemaking did support Steere's, the exhibit was filed in violation of §39-1-12.[17] The council argues that the commission abused its discretion by allowing the testimony of the company's expert because "it left the Consumers' Council uncertain as to precisely what testimony the company ultimately relied upon to justify its rate base and cost of service."

The commission in its report and order allowed Steere's testimony to remain part of the record. In so doing, the commission noted the following;

> "We have allowed Mr. Steere's exhibits and testimony to remain in the record because we have been able to analyze the data sufficiently to go beyond his numbers, and discern the justifiability of those of his adjustments that have been allowed. To have stricken the evidence from the record would have caused untenable delays in the progress of this rate proceeding. Such delays may be punitive to Providence Gas, as well as to other utility companies awaiting availability of Commission time for action on other matters. The Commission's function is not to punish, but to efficiently and expeditiously regulate the rates of the jurisdictional utilities.
>
> "It should be noted, however, that our determination not to strike Mr. Steere's exhibits is one forced from practical considerations which are before us today; we are not impressed with this method of case presentation, and don't expect to see it again. The

---

[17]This section authorizes the commission to hold prehearing conferences at which the commission may order the parties to file all exhibits they intend to use at the hearing. Such a procedure was followed in this case. However, we have pointed out that an exhibit which has not been prefiled may still make its way into evidence if the commission, in the exercise of its discretion, thinks it is necessary. *Rhode Island Consumers' Council* v. *Smith*, 111 R.I. 271, 302 A.2d 757 (1973).

> practical considerations may not be so overwhelming the next time around."

The basic problem here is that the foundation for Steere's testimony was laid after his exhibits were received. However, §39-1-11 provides that at a hearing "the commission shall not be bound by technical rules of evidence." The testimony offered by the other experts provided a sufficient basis for the commission to "analyze the data" and adjustment figures proposed by Steere. Moreover, we do not find that the commission abused its discretion by allowing the late-filed testimony to lend support for Steere's testimony. Lastly, the commission found, as a matter of fact, that there was sufficient evidence before it to determine the justifiability of Steere's recitation. We see no reason to disturb its findings.

## V.   The Role of the Attorney General's Department

In *Narragansett Elec. Co. v. Harsch,* 117 R.I. 395, 368 A.2d 1194 (1977), this court examined the respective responsibilities of the Public Utilities Commission and the Division of Public Utilities Commission and the Division of Public Utilities and Carriers under G.L. 1956 (1969 Reenactment) title 39, as amended by P.L. 1969, ch. 240, §1. We held that while the commission exercises a judicial function, the division, in addition to its regulatory powers, appears on behalf of the public to present evidence and to make arguments before the commission. *Id.* at 404, 368 A.2d at 1199-1200. Moreover, pursuant to the authority of §39-1-19, the division may require the Attorney General to represent it at these hearings. In *Narragansett,* we did not reach the question of whether or not the Attorney General, under §39-1-20, could provide staff counsel to the commission as well as represent the division. We do now; he may not.

As we have said before, "the commission is required to determine and to adjudicate matters before it as an impartial and independent quasi-judicial tribunal." *Narragansett Elec. Co. v. Harsch, supra* at 405, 368 A.2d at 1201. If the commission, the arbiter, and the division, the adversary, are counselled by the same department, the possibility of prejudice is patent. Section 39-1-20, though providing that both the commission and the department "may employ legal counsel," is couched in terms of impartiality. The fact that the Attorney General is potentially at the immediate disposal of the division precludes his office from correspondingly advising the commission. While there was no showing of actual prejudice by this conflict of interest in the proceeding below, the potential conflict is enough to prohibit the procedure in subsequent hearings. *See Horn* v. *Township of Hilltown*, 461 Pa. 745, 337 A.2d 858 (1975).

### Conclusion

In "Providence Gas Company v. Edward Burman et al., Members of the Public Utilities Commission," No. 76-57-M.P., the petition for certiorari is denied and dismissed pro forma.

In "Rhode Island Consumers' Council v. William W. Harsch, Chairman of the Public Utilities Commission, et al.," No. 76-74-M.P., the petition for certiorari is denied and dismissed pro forma.

Jurisdiction is retained over the remaining petitions, but, so far as the company's petition relates to the timeliness of the council's certiorari petitions, the averaging issue, construction work in progress, a 15 percent return on equity, the Algonquin sale, and the Attorney General's role, it is denied and dismissed; and, insofar as the council's petition relates to the Newport acquisition, an 11 percent return on equity, and the alleged failure of proof, it, too, is denied and dismissed.

The records certified to this court are ordered returned to the commission with a direction that it review the evidence and testimony in the present record as it pertains to the cash working capital allowance, the 1 percent increment, the company's lobbying fees and charitable contributions, and the SNG undercollections. The record may be supplemented by such further testimony as may be offered pursuant to the petition of any party or by the commission's own direction, and it shall then make further findings and orders that relate to the issues to which we have just alluded and which are in harmony with this opinion. Thereafter, any party dissatisfied with the commission's supplementary orders may, by a motion filed in this court within 20 days following the commission's action, bring the matter before us for further consideration.

*Hinckley, Allen, Salisbury & Parsons, Michael DeFanti and Robert J. Ferranty* (for Providence Gas Company), *Roberts & Wiley Incorporated, Dennis J. Roberts II* (for Rhode Island Consumers' Council), for petitioners.

*Julius C. Michaelson*, Attorney General, *R. Daniel Prentiss*, Special Assistant Attorney General, for respondents.