The NARRAGANSETT ELECTRIC
COMPANY,

v.

PUBLIC UTILITIES COMMISSION
et al.

No. 2000–235–M.P.

Supreme Court of Rhode Island.

May 16, 2001.

Peter Lacouture/Andrew B. Prescott, Providence, Ronald Gerwatowski, Westboro, MA, for Plaintiff.

Paul J. Roberti, Adrienne Southgate, Providence, for Defendant.

Present: WILLIAMS, C.J., LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

## OPINION

LEDERBERG, Justice.

The Narragansett Electric Company (Narragansett or the company) has sought our review of a decision of the Public Utilities Commission (commission) that ordered the company to pay a $1.65 million refund to the company's ratepayers. The refund represented Narragansett's overpayments for transmission costs to New England Power Company (NEPCO) during 1997 to 1998. It is our conclusion that the commission did not err in ordering the refund to ratepayers, and therefore we affirm its decision.

## Facts and Procedural History

In an effort to introduce competition into the utility industry, the General Assembly enacted the Utility Restructuring Act (URA) in 1996. P.L.1996, ch. 316, § 1.[1] Among the changes made by the URA was the requirement that electric rates be "unbundled." Accordingly, Narragansett, as an electric distribution company, was required to "file with the commission unbundled rates which separately identify charges for use of transmission and distribution facilities and provide for retail access." G.L.1956 § 39–1–27.3(e). The statute further directed that "each electric distribution company shall offer retail access from nonregulated power producers" to commercial and industrial customers and state accounts, § 39–1–27.3(a), and required Narragansett to "conspicuously display" the charges for each component of its unbundled services on its electric bills. G.L.1956 § 39–3–37.3. In 1997, Narragansett complied with these mandates and separated its charges into various component parts, including transmission charges, transition charges, demand side management, power supply, and taxes.

Additionally, electric distribution companies such as Narragansett were directed to implement a "performance based rate" (PBR) plan "[t]o prevent residential customers from paying higher rates as a result of the phased introduction of competition to commercial and industrial customers * * * and to hold overall rate increases to the level of inflation." Section 39–1–27.5(a). Companies were precluded from increasing utility rates from January 1, 1997, to December 31, 1998 (the PBR period), during which time companies were allowed only PBR increases based on the consumer price index. *Id.* Statutory safeguards protected the company if it suffered significant declines in its return on common equity during the PBR period, and conversely, prevented a windfall to the company in the event excessive gains accrued on such returns. Specifically, if the return on common equity of the company fell below 6 percent, measured from the respective twelve-month period ending September 30 of each year, the company could charge ratepayers a surcharge during the following twelve months. *Id.* If the return on equity exceeded the 11 percent commission-authorized return during those periods, a refund was required.[2] *Id.* As long as the company's earnings on common equity were within the range of 6 percent to 11 percent, no other adjustments were allowed, except for certain charges that are not applicable here.[3]

During the PBR period, NEPCO provided interstate transmission services to Narragansett, for which NEPCO charged rates allowed by the Federal Energy Reg-

---

1. The URA is codified in various chapters and sections of G.L.1956 titles 39 and 42.

2. The 11 percent figure is not specified in G.L.1956 § 39–1–27.5. Instead, the statute refers to the "currently allowed rate" as the highest rate of return that may be earned without incurring a refund· obligation. The commission in its decision and the parties in their briefs cited 11 percent as the "currently allowed rate."

3. Section 39–1–27.5(a) provides:
   "Nothing in this paragraph shall be deemed to preclude an electric distribution compa-

ny from seeking approval from the commission for:
   "(1) Changes in the fully reconciling adjustment clauses in place to reflect changes in the cost of fuel and demand side management programs;
   "(2) Reconciling adjustments pursuant to purchase power clauses that do not reflect increases in level of wholesale rates;
   "(3) Revenue neutral rate design changes; and
   "(4) Accounting changes."

ulatory Commission (FERC). The rates were implemented by NEPCO, subject to retrospective review by FERC. If the rates charged by NEPCO to Narragansett were deemed excessive, then a refund of the amount ultimately determined to be excessive would be ordered.

In July 1996, NEPCO filed with FERC tariff No. 9 that established the rates that NEPCO charged Narragansett for transmission and ancillary services. The rates became effective, subject to refund. It is undisputed that tariff No. 9 increased Narragansett's transmission costs.

In April 1999, FERC approved a settlement authorizing a refund of $1,651,988, an amount that represented excess payments that Narragansett had paid pursuant to tariff No. 9. Neither party has alleged that the return on equity, with or without the refund, was lower than 6 or higher than 11 percent during the PBR period.[4] The parties agreed that Narragansett received a total of $18.1 million in PBR increases for 1997 and 1998.

A hearing was held in May 2000, at which the Division of Public Utilities and Carriers (division) advocated that the $1.65 million refund be passed on to the ratepayers; Narragansett argued that the refund should be retained by its equity holders. The commission determined that the ratepayers were entitled to the refund. Narragansett filed a petition for certiorari, pursuant to G.L.1956 § 39–5–1, and we granted the writ in accordance with § 39–5–2.

Narragansett argued on appeal that it underrecovered $5.4 million in its transmission expenses during the relevant period and that it was therefore entitled to keep the refund under this Court's holdings in *Roberts v. Narragansett Electric Co.*, 470 A.2d 215 (R.I.1984) and *Blackstone Valley Electric Co. v. Public Utilities Commission*, 543 A.2d 253 (R.I.1988). The company acknowledged that it received $18.1 million in PBR increases, but it argued that none of that amount was allocated to transmission expenses. The company stated, "It is indisputable that, had Narragansett paid the just and reasonable rates later approved by FERC * * * for all of 1998, there would have been no refund owed to its customers." According to Narragansett, its only refund obligation under the URA would be incurred if its rate of return exceeded 11 percent for the relevant period, clearly not the case here.

The division argued that the PBR increases were designed to—and actually did—compensate Narragansett for all operating cost increases, including transmission costs. The division contended that the ratepayers and not Narragansett's equity holders provided the capital to pay tariff No. 9 expenses, and thus, ratepayers were entitled to the refund under the holdings in *Roberts* and *Blackstone*. Further, the division maintained that providing the refund to Narragansett would constitute a retroactive rate increase that was prohibited by statute and case law.[5]

---

**4.** Narragansett reported that the return on equity for the period ending September 30, 1998, would have been 9.03 percent with the refund included and 8.55 percent without the refund. The division noted that the returns on equity for the calendar years 1996 to 1999 were 7.25 percent, 8.79 percent, 10.55 percent and 11.03 percent, respectively.

**5.** The Energy Council of Rhode Island (TEC RI), an intervenor in the proceeding before the commission, advocated that the refund be returned to the ratepayers. In its brief to this Court, TEC–RI argued that retaining any refund was precluded by equitable principles and by its interpretation of a Transmission Service Cost Adjustment Provision that became effective January 1999.

## Standard of Review

■ This Court's standard of review of the commission's decisions has been summarized in *Providence Water Supply Board v. Public Utilities Commission,* 708 A.2d 537, 541 (R.I.1998): "[T]his Court, 'may reverse or affirm the judgments and orders of the commission and may remand a cause to it with such mandates as law or equity shall require,'" quoting § 39–5–4. Moreover,

"The findings of the commission on questions of fact shall be held to be prima facie true, and as found by the commission[,] and the supreme court[ ] shall not exercise its independent judgment nor weigh conflicting evidence. An order or judgment of the commission made in the exercise of administrative discretion shall not be reversed unless the commission exceeded its authority or acted illegally, arbitrarily, or unreasonably." Section 39–5–3.

"In addition, it is well settled that this Court reviews judgments and orders of the [commission] solely to 'determine whether the commission's findings are lawful and reasonable, fairly and substantially supported by legal evidence, and sufficiently specific to enable us to ascertain if the evidence upon which the commission based its findings reasonably supports the result.'" *Providence Water Supply Board,* 708 A.2d at 541.

■ The parties disputed the appropriate standard of review to be applied in this case. Consistent with our previous holdings such as *Providence Gas Co. v. Malachowski,* 656 A.2d 949, 951 (R.I.1995); *Pine v. Malachowski,* 659 A.2d 674, 676 (R.I.1995); *Providence Gas Co. v. Malachowski,* 600 A.2d 711, 714 (R.I.1991), and *South County Gas Co. v. Burke,* 551 A.2d 22, 24 (R.I.1988), we give appropriate deference to factual findings of the commission. However, we shall review *de novo*

any statutory interpretations. *See In re: Petition for Review Pursuant to § 39–1–30 of Ordinance Adopted by the City of Providence,* 745 A.2d 769, 773 (R.I.2000) (Court reviews commission's interpretation of statutes *de novo*).

## Fact-finding by the Commission

In affirming a decision of the commission, we defer to the commission's findings of fact. In *South County Gas Co.,* we pointed out that we shall not "disturb an order promulgated in the exercise of [the commission's] administrative discretion unless the commission clearly exceeds its statutory authority or acts illegally, arbitrarily, or unreasonably." 551 A.2d at 24 (citing § 39–5–3 and *In re Woonsocket Water Dept.,* 538 A.2d 1011, 1013 (R.I. 1988), and holding that the commission's decision to accept the accounting calculation of one expert over another was within the sound discretion of the commission). We have also noted that "[t]he factfinding task is expressly reserved for the commission, and the court is not to substitute its judgment for the commission's * * * [whose] findings are presumed reasonable 'until shown to be clearly, palpably and grossly unreasonable.'" *Providence Gas Co.,* 600 A.2d at 714 (quoting *New England Telephone & Telegraph Co. v. Public Utilities Commission,* 116 R.I. 356, 377, 358 A.2d 1, 15 (1976)). It is our opinion that the company has not met the heavy burden required for this Court to overturn the commission's findings of fact in this case.

## Statutory Interpretation

■ *Roberts* and *Blackstone Valley Electric Co.,* cited by Narragansett in support of its position, were decided in 1984 and 1988, respectively. The URA, however, was enacted in 1996 and has largely

superseded those cases with respect to the disposition of this refund.

The URA directed that during the PBR period, the company was entitled to rate increases determined by the consumer price index. Section 39–1–27.5(a). It is undisputed that Narragansett received those increases in the amount of $18.1 million. The company was not entitled to receive additional sums during the PBR period unless its return on equity had fallen below 6 percent, which it admitted was not the case. Accordingly, the refund, which essentially represented charges in excess of those provided by the PBR increase, must be returned to the ratepayers.

Our conclusion here reflects an interpretation of the URA that is consistent with the legislative intent expressed throughout the statute. For example, § 39–1–27.5(b) states, "Nothing in this subsection shall preclude the commission from considering the interests of ratepayers in the interpretation of this subsection." Subsection (a) of § 39–1–27.5 states that the PBR provisions were implemented "[t]o prevent residential customers from paying higher rates * * * and to hold overall rate increases to the level of inflation." Further, the legislative findings and declarations set forth in the URA provide in pertinent part:

"(1) That lower retail electricity rates would promote the state's economy and the health and general welfare of the citizens of Rhode Island;

"(2) That current research and experience indicates that greater competition in the electricity industry would result in a decrease in electricity rates over time;

"(3) That greater competition in the electricity industry would stimulate economic growth;

"(4) That it is in the public interest to promote competition in the electricity industry and to establish performance based ratemaking for regulated utilities; [and]

" * * *

"(7) That in a restructured electrical industry the same protections currently afforded to low income customers shall continue." Section 39–1–1(d).

It is our opinion that the commission correctly applied the statute and properly incorporated the Legislature's intent in rendering its decision. Moreover, substantial evidence existed that the $18.1 million provided by the PBR mechanism fully compensated the company for its increased transmission costs. This evidence included testimony by John K. Stutz, Ph.D. (Stutz), an expert in utilities regulation, who testified on behalf of the division that the PBR did compensate the company for the increased costs in that category.[6] He further testified that the company's revenues were not adversely affected during the PBR period, noting that "during the period the Company claims the PBR was forcing it to absorb incremental transmission costs, its ROE [return on equity] was

---

**6.** In testimonial evidence submitted to the commission before the hearing, Stutz was asked, "During the PBR period, did the company absorb incremental transmission costs?" He responded,

"No. PBR mechanisms provide a pool of revenue increases which a utility can utilize to cover a range of costs. During 1997 and 1998, operation of the PBR mechanism provided Narragansett with a total of $18.1

million in additional revenues. * * * The $18.1 million alone was substantially more than the $5.4 million in incremental transmission costs which the company claims it absorbed. * * * [I]ncreases in transmission costs during the PBR period were to be covered by the additional revenues provided by the PBR mechanism. And, in fact, they were covered as the revenue data above indicates * * *."

about *25 percent* higher than it was during the comparable period before the PBR went into effect."

It is clear that the commission assessed the evidence and rejected the company's argument that because the company allocated none of the sums provided to it by the PBR increase to transmission expenses, it suffered an underrecovery. Instead, the commission found that the PBR increases were sufficient to compensate the company for increases in transmission expenses [7] and pointed out that the sums provided for by the PBR were available for application to those expenses.[8] The commission also found that because the returns on equity during the PBR period exceeded the 6 percent minimum provided under the URA, the company was fully compensated for all costs incurred for 1997 and 1998. Moreover, in finding that Narragansett recovered all its expenses during the PBR period, the commission rendered a decision that was fairly and substantially supported by the evidence. Therefore, the commission did not "exceed[ ] its authority or act[ ] illegally, arbitrarily, or unreasonably." Section 39–5–3.

In both *Roberts* and *Blackstone Valley Electric Co.*, underrecovery represented "sums which [the company] paid from its own equity resources." *Blackstone Valley Electric Co.*, 543 A.2d at 255. Both decisions rested on equitable principles. *Roberts* interpreted tariff language that called for an "equitable adjustment" to rates when a refund is due and relied on equitable principles in deciding which party should receive the refunds. *Roberts,* 470 A.2d at 217. The equitable principles were reaffirmed in *Blackstone Valley Electric Co.*, 543 A.2d at 255, in which we wrote that "[a]ny other disposition [of the refund] would be unfair and inequitable. * * * We believe that all tariffs should be interpreted in accordance with equity and good conscience regardless of the specific language in which they may be couched." It is our opinion that the principle of equitable recovery is applicable to rates established under the URA. As applied to this case, even if the company had incurred underrecoveries in one category, its returns on equity increased from 7.25 percent to 11.03 percent between 1996 and 1999. As the commission noted, "if the company was able to realize a compensatory rate of return under the URA, it cannot rationally argue that any expenses during that period were unrecovered."

In this case, there were no net underrecoveries or returns on equity that fell below 6 percent during 1997 and 1998. *See,* note 3, *ante.* Therefore, the refund did not represent monies that the company "otherwise would have been able to retain for its equity holders," as Narragansett suggested, nor did the refund represent "sums which [the company] paid from its own equity resources." *Blackstone Valley Electric Co.*, 543 A.2d at 255. The higher FERC-mandated rates were paid by the ratepayers *via* the PBR increases. The total return on equity, in our opinion, was sufficient "to attract new capital investment and adequately compensate present

---

**7.** The commission stated in its decision: "The validity of the Division's argument is evidenced by the fact that the Company's revenues during the PBR period were sufficient to cover not only all of its expenses, but also to enable it to realize an increasing return on equity within and subsequent to the PBR period. * * * [I]f the Company was able to realize a compensatory rate of return under the URA, it cannot rationally argue that any expenses during that period were unrecovered."

**8.** Narragansett conceded that the PBR increases "were designed to be the exclusive compensation available to Narragansett for any increased costs of doing business during [the PBR] period."

investors while insuring that the public interest is adequately protected." *Providence Gas Co. v. Burman,* 119 R.I. 78, 93, 376 A.2d 687, 695 (1977). In the absence of an underrecovery, any refund of those charges is owed to the ratepayers, in accordance with the equitable principles of *Roberts* and *Blackstone Valley Electric Co.* and in furtherance of the legislative intent set forth in the URA.

In conclusion, therefore, we affirm the commission's decision, deny the petition for certiorari, quash the writ previously issued, and return the record to the Public Utilities Commission with our decision endorsed thereon.