**Supreme Court**

No. 2020-115-M.P.
(Docket No. 4688)

In re Block Island Power Company     :
 Petition for Declaratory Judgment.

NOTICE:  This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email opinionanalyst@courts.ri.gov, of any typographical or other formal errors in order that corrections may be made before the opinion is published.

In re Block Island Power Company    :
 Petition for Declaratory Judgment.

Present: Suttell, C.J., Goldberg, Robinson, Lynch Prata, Long, JJ.

**O P I N I O N**

**Chief Justice Suttell, for the Court.** This Court issued a writ of certiorari to review a decision and judgment of the Public Utilities Commission (the PUC) regarding the Town of New Shoreham Project, enacted by G.L. 1956 § 39-26.1-7. The petitioner, Block Island Utility District d/b/a Block Island Power Company (BIPCo), requests a reversal of the PUC's decision to deny BIPCo's petition for a declaratory judgment. BIPCo sought a declaratory judgment declaring that the enabling act, specifically § 39-26.1-7(f), requires the costs for BIPCo's interconnection facilities and backup transformer to be socialized across all electric ratepayers in Rhode Island, not just those in the Town of New Shoreham (Block Island or the town).[1] As an intervening party, Narragansett Electric Company d/b/a National Grid (National Grid) argued before the PUC that § 39-26.1-7(f) does not

---

[1] This opinion will use the terms Block Island, the Town of New Shoreham, and the town, interchangeably.

encompass BIPCo's interconnection facilities or backup transformer and, therefore, BIPCo and its ratepayers are solely responsible for those costs. The PUC issued a decision and judgment against BIPCo. For the reasons stated herein, we affirm the decision of the PUC.

# I

## Facts and Travel

We glean the facts in this case from the PUC's decision and judgment, the transcripts of both open meetings held before the PUC, and the submissions of the parties.

### The Town of New Shoreham Project

In 2009, the Legislature enacted § 39-26.1-7 (the enabling act), which authorized the Town of New Shoreham Project (the project). The enabling act greenlit the construction of a five-turbine wind farm off the coast of Block Island, which is twelve miles south of Rhode Island's mainland. Specifically, the enabling act declared that the project would "facilitate the construction of a small-scale offshore wind [farm] * * * including an undersea transmission cable that interconnects Block Island to the mainland[.]" Section 39-26.1-7(a).[2] Within the

---

[2] The Block Island wind farm was completed in 2016 and BIPCo interconnected to it in May 2017. There is no dispute among the parties that the interconnection exists and operates today. The matter before this Court concerns the allocation of certain costs between BIPCo and National Grid, according to the terms of the enabling act.

statute, the Legislature described its vision for this small-scale wind farm to be a "demonstration project[.]" Section 39-26.1-7(a).  As the first of its kind in the nation, the Block Island wind farm was meant to symbolize Rhode Island's unique role pioneering solutions for renewable energy across the United States.

Section (a) of the enabling act enumerated four public-policy goals driving the project; namely, to (1) "position the state to take advantage of the economic development benefits of the emerging offshore wind industry"; (2) "promote the development of renewable energy sources that increase the nation's energy independence from foreign sources of fossil fuels"; (3) "reduce the adverse environmental and health impacts of traditional fossil fuel energy sources"; and (4) "provide the town of New Shoreham with an electrical connection to the mainland." Section 39-26.1-7(a).

When the Legislature passed the enabling act, Block Island was not at all connected to Rhode Island's mainland electrical grid.  For many years, without a hookup to mainland power, Block Island sourced its electricity exclusively from diesel-powered generators.  These generators were operated by Block Island's sole electric utility provider, BIPCo.[3]  One of the imperatives for the enabling act was to, at last, provide Block Island with an alternative power source that would render its polluting diesel generators obsolete.

---

[3] At the time the enabling act was passed, BIPCo was a privately owned company.

The vehicle for this new power source—and the subject at the heart of this case—is an underwater transmission cable. *See* § 39-26.1-7(f). This cable is but one piece of the multifaceted project, which includes the five-turbine wind farm, an underwater transmission cable connecting the wind farm to a National Grid-owned and -operated substation on Block Island, the substation, and an underwater transmission cable connecting the substation to the mainland grid in the Town of Narragansett. Of the two transmission cables involved in the project, the one relevant to this case is the second—the cable that runs from National Grid's substation on Block Island to the mainland. *See* § 39-26.1-7(a) (contemplating "an undersea transmission cable that interconnects Block Island to the mainland").

This system operates by transmitting wind-generated power from the turbines to the National Grid substation via the first transmission cable, at which point it diverts energy from the substation to BIPCo's local distribution system and then transfers the remaining power, unused by BIPCo's customers, to the mainland grid via the second transmission cable. Thus, the substation serves as the juncture—or interconnection—between BIPCo's distribution system and National Grid's network accessing the mainland.

The two pieces of infrastructure at issue in this case are (1) BIPCo's interconnection facilities and (2) the backup transformer. BIPCo's interconnection facilities include the "wooden poles, overhead lines, a switch, and circuit breaker"

- 4 -

required to connect its local distribution system to the National Grid substation where it receives power from the wind farm. The backup transformer would, as the name suggests, act as a backup for the principal transformer that powers BIPCo's interconnection to the substation.[4] BIPCo argues that both units—the interconnection facilities and backup transformer—are covered in the cost allocation scheme laid out in section (f) of the enabling act.

Section (f) of the enabling act governs the construction, ownership, and cost allocation associated with the transmission cable project. Section 39-26.1-7(f). In relevant part, section (f) provides that "the [Division of Public Utilities and Carriers] shall support transmission rates and conditions that allow for the costs related to the *transmission cable and related facilities* to be charged in transmission rates in a manner that *socializes the costs throughout Rhode Island*." *Id.* (emphasis added). This portion of section (f) provides the basis for BIPCo's claim that its

---

[4] Typically, utility servicers retain spare or backup transformers because weather and manufacturing defects commonly cause outages. Here, however, the transformer powering BIPCo's electricity supply to the island requires a special voltage due to the unique nature of the wind-powered project. As such, an additional transformer for this project is inordinately expensive and threatens extensive delays to build and obtain. BIPCo claimed that it could take as long as six months to procure a replacement transformer if necessary, which would force BIPCo to resort to its diesel generators to provide the island with power. At the time BIPCo petitioned the PUC for a declaratory judgment, BIPCo had not yet procured a backup transformer from National Grid, but discussions between the two entities concerning the cost and specifications for the transformer had taken place.

interconnection expenses should be socialized to all Rhode Island ratepayers because, arguably, those expenses qualify as "related facilities" costs.[5]

Section (f) also granted National Grid the option to own and operate the transmission cable project by purchasing "the transmission cable and related facilities" from the developer. Section 39-26.1-7(f) ("The electric distribution company, at its option, may elect to own, operate, or otherwise participate in such transmission cable project. * * * The electric distribution company may elect to purchase the transmission cable and related facilities from the developer or an affiliate of the developer, pursuant to the terms of a transmission facility's purchase agreement[.]"). On January 15, 2015, National Grid exercised that option and purchased the transmission cable project from the wind farm developer, Deepwater Wind Block Island, LLC (Deepwater), including the "engineering, permits, property rights, and other development work[.]" Deepwater subsequently constructed and installed the wind turbines, while National Grid built the Block Island substation and the underwater transmission cables connecting the wind farm, the island, and the mainland.

---

[5] Before the PUC and in its briefs, BIPCo claimed that its facility interconnection costs summed to $263,700; grid interconnection costs were $1,836,000; and the spare transformer cost was $450,000. The total cost, $2,549,700, socialized among the roughly two thousand Block Island ratepayers would translate to a charge of $1,275 per customer. That amount would be collected from BIPCo's ratepayers over a six-year amortization period. If the total cost were to be socialized across all Rhode Island ratepayers, the charge would come to about $5 per customer.

**The Local Service Agreement**

The project is subject to the authority of ISO-New England Inc. (ISO-NE), a private, nonprofit entity that operates within the federal regulatory hierarchy headed by the Federal Energy Regulatory Commission (FERC).[6] ISO-NE promulgates transmission rates, terms, and conditions for utility projects operating in New England through its ISO-NE Transmission, Markets and Services Tariff (the ISO-NE tariff), which ensures regional compliance with federal standards.

As required by federal regulation, four agreements were filed with FERC in connection with the project, including a Local Service Agreement (LSA) executed between BIPCo (the Transmission Customer), New England Power Company (NEP) (the Transmission Owner), and ISO-NE (the Regional Transmission Organization). The LSA between BIPCo, NEP, and ISO-NE incorporated all terms of the ISO-NE tariff. The original LSA was submitted, uncontested, before FERC, allowing the commission to simply approve the agreement as presented without imposing its own determination.

---

[6] ISO-NE serves as one of the many independent system operators or regional transmission organizations in the nation created by FERC in the late 1990s. *See Regional Transmission Organizations*, 89 FERC ¶ 61,285 (Dec. 20, 1999); *see also* 18 C.F.R. § 35.34. ISO-NE manages the power companies that own the transmission lines in New England, in this case New England Power Company—a wholly owned subsidiary of National Grid—under a set of rates, terms, and conditions contained in the ISO-NE Transmission, Markets and Services Tariff (ISO-NE tariff).

In a letter to FERC dated April 7, 2015, NEP and ISO-NE jointly sought to amend the original LSA because the Division of Public Utilities and Carriers (the division) determined that the original LSA did not comply with the enabling act. Specifically, the division informed NEP and ISO-NE that the LSA improperly calculated the transmission cable surcharge because it did not assess a higher rate to Block Island ratepayers, as section (f) directs.[7] To rectify the error and bring the LSA—and by extension the tariff—in compliance with section (f), the LSA was amended to adjust the rate calculation such that Block Island ratepayers would never pay less than 120 percent of the rate charged to typical National Grid customers.

---

[7] Section (f) provides that the transmission rates for the cable shall be calculated in the following manner:

> "The allocation of the costs related to the transmission cable through transmission rates or otherwise shall be structured so that the estimated impact on the typical residential customer bill *for transmission costs for customers in the town of New Shoreham shall be higher* than the estimated impact on the typical residential customer bill for customers on the mainland of the electric distribution company. This higher charge for the customers in the town of New Shoreham shall be developed by allocating the actual cable costs based on the annual peak demands of [BIPCo] and the electric distribution company, and these resultant costs recovered in the per-KWh charges of each company. * * * [T]he difference in the individual charge per KWh or per customer/month shall not exceed the ratio of average demand to peak demand for [BIPCo], relative to the electric distribution company, currently at 1.8 to 1.0 respectively." Section 39-26.1-7(f) (emphasis added).

FERC tariffs, including the ISO-NE tariff, typically contain "Direct Assignment Facility" (DAF) charges that an interconnecting customer must pay to the electric distribution company as reimbursement for the cost of connecting the new customer to the existing grid. BIPCo's LSA contained a rate schedule, Schedule 21, which listed the DAF charges BIPCo owed to National Grid for the cost of connecting to the grid. The DAF charges included under Schedule 21 were as follows: "Interconnection facilities and associated equipment: [one ]34.5kV breaker, [one ]34.5/4.16kV/2.4kV transformer, [and a] 5kV insulated line to customer substation and associated equipment." Schedule 21, however, by its own terms, operated "in accordance with the rates, terms and conditions of Schedule 21-NEP[,]" which came from the ISO-NE tariff and was incorporated by reference into the LSA. Schedule 21-NEP included pro forma language providing:

> "[I]nterconnection facilities and additional facilities shall be the financial responsibility of the Transmission Customer, to the extent consistent with Commission policy."

BIPCo did not dispute any of the LSA terms quoted above, but rather argued before the PUC that the enabling act language controls. BIPCo submitted that the division's previous amendment to bring the LSA in conformity with section (f) established that the enabling act trumps the tariff. National Grid disputed BIPCo's argument, cautioning the PUC that a ruling in favor of BIPCo would challenge the

- 9 -

tariff's authority, flout FERC's plenary jurisdiction over the wholesale energy market, and potentially create federal preemption issues.

**The PUC Decision**

On January 31, 2017, BIPCo filed a petition for declaratory judgment before the PUC. BIPCo contended that it should not be solely responsible for shouldering the costs of (1) the interconnection facilities required to hook up to National Grid's substation and (2) the backup transformer because these are "related facilities" with respect to the transmission cable that should be socialized to all Rhode Island ratepayers per § 39-26.1-7(f). BIPCo averred that FERC precedent, which requires interconnecting customers to pay for interconnections to the main grid, does not apply to BIPCo because § 39-26.1-7(f) is a "specific provision that overrides the general interconnection tariff." Additionally, BIPCo maintained that the backup transformer is not a proper DAF charge under the LSA because the LSA refers to only one transformer, not a second, backup transformer.

On February 25, 2017, National Grid intervened and filed an objection to BIPCo's petition. National Grid advanced two key arguments, first that categorizing BIPCo's interconnection expenses as socialized costs would contradict FERC precedent; and second that § 39-26.1-7(f) unambiguously excludes the costs for which BIPCo seeks reimbursement because the statute makes no reference to BIPCo's interconnection or its transformer.

- 10 -

In March 2017, the division filed a memorandum in support of National Grid's objection. The division argued that the socialization for "related facilities" should be limited solely to those costs incurred by National Grid, not BIPCo. The division also concurred with National Grid's claim that BIPCo's interconnection is entirely separate from the socialization scheme the Legislature established in section (f).

On May 30, 2017, the PUC held an open meeting to hear oral arguments from BIPCo, National Grid, and the division. At the meeting, BIPCo argued that the PUC should construe "related facilities" to include its interconnection facilities and backup transformer because such a reading would (1) be consistent with the legislative intent of the statute; and (2) properly regard the statute, not the ISO-NE tariff, as the prevailing authority for the cable cost calculations.

National Grid countered BIPCo's claims with several arguments, asserting that (1) the Legislature never intended all costs to be socialized, only those incurred by National Grid for the assets it bought from Deepwater; (2) the enabling act does not override the ISO-NE tariff; (3) BIPCo's interconnection facilities and backup transformer are "sole-use"—or facilities that benefit only the customer—which FERC precedent requires the customer to cover; and (4) deciding for BIPCo would open the door for other similarly situated customers to seek recovery for interconnecting costs.

In an open meeting held on July 27, 2017, the PUC issued its decision with two votes in favor of National Grid and one vote against. The majority of commissioners were convinced that FERC precedent and the ISO-NE tariff contemplate BIPCo as an ordinary, voluntary interconnecting customer solely responsible for the costs of interconnection. Chairwoman Curran discussed "how interconnections are dealt with in the wholesale market" and stated that, typically, "the interconnection to something like the cable * * * is the responsibility of the customer." Commissioner Gold also added that § 39-26.1-7 does not technically require BIPCo to interconnect to the project at all and that "the legislative goal" of "moving the state and the region off fossil fuels * * * can be met even if Block Island were to continue to use their diesel generators."

In its written decision, the PUC majority engaged with the statutory interpretation issue in greater detail and reasoned that "the transmission cable and related facilities are treated [in the statute] as a package of items." The conjunctive phrase "transmission cable *and* related facilities" deliberately "isolate[d] the equipment and infrastructure as items that National Grid * * * elect[ed] to purchase from the developer[,]" according to the PUC. (Emphasis added.) This infrastructure included everything National Grid received from Deepwater, but not the interconnection facilities, which pertain exclusively to BIPCo and were never owned by Deepwater. The PUC decided that, because BIPCo's facilities were not

"necessary to serve the developer's project," they are not "related facilities" to the transmission cable under § 39-26.1-7(f) and that the costs thereof were not subject to be socialized.

Commissioner DeSimone did not pen a written dissent, but he did articulate his reasons for opposing the majority's decision at the July meeting. He stressed that, when viewing the statute in its entirety, it became clear to him that failing to socialize the costs of BIPCo's interconnection would frustrate a fundamental legislative purpose of § 39-26.1-7: to connect the Town of New Shoreham to the mainland. Commissioner DeSimone further dismissed National Grid's concerns that a decision in favor of BIPCo would lead to a slippery slope because the statute is single purpose, necessarily limiting any ruling from the PUC to this case and this project. Finally, Commissioner DeSimone rejected National Grid's claim that BIPCo is a voluntary interconnecting customer, instead perceiving BIPCo as an entity composed of ratepayers—the citizens and businesses of Block Island—who had no choice whether to interconnect. This made the interconnection cost an "involuntary assessment" to Block Island ratepayers, according to Commissioner DeSimone.

The PUC filed a decision and judgment in favor of National Grid on May 6, 2020. On May 12, 2020, BIPCo filed a petition for writ of certiorari, seeking review of the PUC's order, which we granted.

## II

## Standard of Review

The General Assembly has prescribed the standard of review for decisions by the PUC brought before this Court, under G.L. 1956 § 39-5-3:

> "The findings of the commission on questions of fact shall be held to be prima facie true and as found by the commission, and the [S]upreme [C]ourt shall not exercise its independent judgment nor weigh conflicting evidence. An order or judgment of the commission made in the exercise of administrative discretion shall not be reversed unless the commission exceeded its authority or acted illegally, arbitrarily, or unreasonably."

"[T]his Court reviews judgments and orders of the PUC solely to determine whether the PUC's findings are lawful and reasonable, fairly and substantially supported by legal evidence, and sufficiently specific to enable us to ascertain if the evidence upon which the PUC based its findings reasonably supports the result." *In re A & R Marine Corp.*, 199 A.3d 533, 537 (R.I. 2019) (brackets omitted) (quoting *Narragansett Electric Co. v. Public Utilities Commission*, 773 A.2d 237, 240 (R.I. 2001)).

"[P]ure questions of law, including statutory interpretations, decided by the [PUC] are reviewed *de novo* by this Court." *In re Proposed Town of New Shoreham Project*, 25 A.3d 482, 504 (R.I. 2011). "It is well settled that when the statutory language is clear and unambiguous, we give the words their plain and ordinary meaning." *In re Estate of Cardiff*, 266 A.3d 1217, 1219 (R.I. 2022) (quoting *Butler v. Gavek*, 245 A.3d 750, 754 (R.I. 2021)). "It is only when confronted with an

- 14 -

unclear or ambiguous statutory provision that this Court will examine the statute in its entirety to discern the legislative intent and purpose behind the provision." *Liberty Mutual Insurance Company v. Kaya*, 947 A.2d 869, 872 (R.I. 2008) (quoting *State v. LaRoche*, 925 A.2d 885, 887 (R.I. 2007)).

The PUC decision and judgment at issue here is one of statutory interpretation; we, therefore, proceed with our review *de novo*.

## III

## Discussion

This is not the first time that the Block Island wind project has reached this Court. In 2011, in *In re Proposed Town of New Shoreham Project*, we dealt with a dispute concerning the power purchase agreement (PPA) between the electric distribution company, National Grid, and the wind farm developer, Deepwater. *In re Proposed Town of New Shoreham Project*, 25 A.3d at 485-86. Our decision in that case also recounted a thorough history of the project, its inception in the General Assembly, and its previous proceedings before the PUC. *Id.* at 486-504.[8]

Our discussion here pertains only to the narrow question on which BIPCo seeks review: Does the phrase "related facilities," under § 39-26.1-7(f), cover BIPCo's interconnection facilities and backup transformer such that those costs must

---

[8] We encourage the curious reader to review the *In re Proposed Town of New Shoreham Project*, 25 A.3d 482 (R.I. 2011), opinion for a more exhaustive background on the project.

- 15 -

be socialized across all Rhode Island ratepayers?  This is a question of statutory interpretation.

The parties advocate for two opposing interpretations of "related facilities" under § 39-26.1-7(f), National Grid advancing a narrower definition and BIPCo a broader one.  The PUC decided in favor of National Grid, ruling that "related facilities" must be narrowly construed to encompass only the equipment and assets National Grid had the option to purchase from the developer—Deepwater—as part of the transmission cable project. *See* § 39-26.1-7(f).  On the contrary, BIPCo implores this Court to read the statute as a whole and hold that, as a matter of law, "related facilities" must include its interconnection facilities and backup transformer.

"It is well settled that when the statutory language is clear and unambiguous, we give the words their plain and ordinary meaning." *Butler*, 245 A.3d at 754 (quoting *Bayview Loan Servicing, LLC v. Providence Business Loan Fund, Inc.*, 200 A.3d 153, 157 (R.I. 2019)).  Further, "when we examine an unambiguous statute, there is no room for statutory construction and we must apply the statute as written." *Morel v. Napolitano*, 64 A.3d 1176, 1179 (R.I. 2013) (quoting *Mutual Development Corp. v. Ward Fisher & Co., LLP*, 47 A.3d 319, 328 (R.I. 2012)).

The Legislature does not define or itemize "related facilities" in section (f), nor does the term possess any existing meaning in our caselaw to guide this Court's

understanding of its plain and ordinary meaning. Section 39-26.1-7(f); *see Jerome v. Probate Court of Town of Barrington*, 922 A.2d 119, 123 (R.I. 2007) (holding that the terms "encumbrance" and "lien" were not ambiguous because, even though undefined in the statute, these terms "have a particular meaning in our law"). However, even though the Legislature did not define the term "related facilities," it did *qualify* it in a way that extinguishes any ambiguity. *See Freepoint Solar LLC v. Richmond Zoning Board of Review*, 274 A.3d 1, 6 (R.I. 2022) (reasoning that "where the Legislature has not defined *or qualified* the words used within the statute" it is "particularly true" that we must give clear and unambiguous language its plain and ordinary meaning) (emphasis added) (quoting *Drs. Pass and Bertherman, Inc. v. Neighborhood Health Plan of Rhode Island*, 31 A.3d 1263, 1269 (R.I. 2011)).

"Related facilities" is mentioned three times in § 39-26.1-7(f), each time in conjunction with the transmission cable.

First: "The electric distribution company may elect to purchase the *transmission cable and related facilities* from the developer or an affiliate of the developer, pursuant to the terms of a transmission facility's purchase agreement[.]" Section 39-26.1-7(f) (emphasis added).

Second: "Once written consent is provided, the electric distribution company and its transmission affiliate are authorized to make a filing with the Federal Energy Regulatory Commission to put into effect transmission rates to recover all of the

- 17 -

costs associated with the purchase of the *transmission cable and related facilities* and the annual operation and maintenance." Section 39-26.1-7(f) (emphasis added).

Third: "The division shall support transmission rates and conditions that allow for the costs related to the *transmission cable and related facilities* to be charged in transmission rates in a manner that socializes the costs throughout Rhode Island." Section 39-26.1-7(f) (emphasis added).

Observing these three uses of "related facilities," National Grid insists that the phrase is clear and unambiguous. Looking to the first use, National Grid argues that "related facilities" refers to the transmission cable project exclusively as National Grid acquired the project from the developer. Moreover, because the developer never owned BIPCo's interconnection facilities, National Grid contends, those facilities cannot possibly be related to the transmission cable project optioned from Deepwater.

As to the second use, National Grid contends that "related facilities" covers only the infrastructure for which "the electric distribution company and its transmission affiliate" would seek reimbursement through transmission rates filed with FERC. Section 39-26.1-7(f). National Grid also emphasizes that section (f) never mentions the words *interconnection facilities* or *transformer*. Such glaring omissions must, National Grid argues, signal that the Legislature never intended for BIPCo's interconnection to be socialized.

- 18 -

And finally, as to the third use, National Grid simply asserts that if the Legislature had intended to socialize all costs associated with the project, including those for BIPCo's interconnection, it would have written that into the statute.

BIPCo, meanwhile, grounds its argument in a more holistic reading of the statute. BIPCo maintains that, because a topline priority of the enabling act is to "provide the town of New Shoreham with an electrical connection to the mainland," any infrastructure facilitating that connection must be, at minimum, "related" to the transmission cable. Section 39-26.1-7(a). Removing the interconnection and backup transformer from the "related facilities" costs socialized to all Rhode Islanders defeats and frustrates the fundamental purpose of the act, according to BIPCo.

Considering these arguments, the PUC based its final decision on National Grid's first argument, concurring that "related facilities" encompasses only the facilities necessary to complete the wind farm as acquired from Deepwater. The PUC ruled, "[I]t is clear from the text of the statute that the 'related facilities' associated with the 'transmission cable' that National Grid was permitted to purchase from the 'developer or affiliate of the developer' includes only those facilities necessary to serve the developer's project, the Block Island Wind Farm."

Having reviewed the matter *de novo*, we agree with the PUC's decision. *See In re Narragansett Electric Company*, 276 A.3d 363, 371 (R.I. 2022). Upon each use of the term "related facilities," the Legislature coupled it with the conjunctive

- 19 -

connector "and" along with "the transmission cable." *See* § 39-26.1-7(f). Reading section (f) according to this plain construction, "related facilities" clearly refers only to those facilities directly involved with the transmission cable project as National Grid purchased it from Deepwater. Purely as a matter of grammar, therefore, the language does not arouse any hint of ambiguity.

We also acknowledge that this reading of section (f) aligns with this Court's previous analysis of the enabling act in *In re Proposed Town of New Shoreham Project*. *In re Proposed Town of New Shoreham Project*, 25 A.3d at 509. In that case, we drew a distinction between the Town of New Shoreham Project, generally, and the transmission cable project, specifically. *See id.* (noting that § 39-26.1-7(f) "refer[s] to National Grid's optional participation in the 'transmission cable project'" and that § 39-26.1-7(g) "distinguish[es] the 'transmission cable project' from 'the Town of New Shoreham Project'").[9] We further opined that "the 'Town of New

---

[9] Section (g) of the enabling act reads, in relevant part:

> "Any charges incurred by [BIPCo] * * * in implementing this section * * * shall be recovered annually in rates through a fully reconciling rate adjustment, subject to approval by the commission. If the electric distribution company owns * * * the transmission cable project, pursuant to section (f) of this section, the provisions of § 39-26.1-4 shall not apply to the cable cost portion of the town of New Shoreham project." Section 39-26.1-7(g).

National Grid argues that any cost-recovery options available to BIPCo are contemplated in section (g), negating any claims it may seek under section (f). This argument does not impact our analysis as we find the language in section (f) to be

- 20 -

Shoreham Project' was the umbrella project over which the contract for the purchase of renewable energy and the 'transmission cable project' were integral, but not necessarily simultaneous parts." *Id.* at 491. We further stated that "the general policy goals for the Town of New Shoreham Project" do not "create an express mandate" for each of its composite parts, including the transmission cable project. *Id.* at 509-10 (rejecting the notion that section (a)'s policy goals informed the requirements for the 2010 PPA because "§ 39-26.1-7(a)'s policy intention * * * of interconnecting Block Island [was] directed at the 'Town of New Shoreham project' to 'effectuate'").

BIPCo's attempt to use the section (a) policy goals to graft new language onto section (f)—like "interconnection" and "transformer"—defies this Court's explicit disaggregation of the Town of New Shoreham Project from the transmission cable project. Section (f) covers the transmission cable project only, which need not advance the general policy goals espoused in section (a). *See In re Proposed Town of New Shoreham Project*, 25 A.3d at 509 (admonishing the petitioners for "cherrypick[ing] and then cobbl[ing] together the overarching policy goals for the Town of New Shoreham Project to form what they allege is a * * * mandate for the 2010 PPA"). BIPCo misunderstands the framework of the enabling act with its contention that the project's goal in section (a) to "provide the town of New

___

unambiguous and exclusive of BIPCo's interconnection costs, regardless of section (g).

- 21 -

Shoreham with an electrical connection to the mainland" must inform the meaning of "related facilities" as it appears in section (f). Sections 39-26.1-7(a), (f). That is not what this Court held in *In re Proposed Town of New Shoreham Project* and it is not what a plain and ordinary reading of the statutory language demands.

Noting that "we accord great deference to the PUC[] * * * and [that] we will not disturb an order unless the PUC 'clearly * * * acts illegally, arbitrarily, or unreasonably[,]'" we observe no grounds to overturn the PUC's decision. *In re Kent County Water Authority Change Rate Schedules*, 996 A.2d 123, 128 (R.I. 2010) (quoting *Narragansett Electric Co.*, 773 A.2d at 240). We hold that "related facilities" clearly and unambiguously excludes the costs of BIPCo's interconnection facilities and backup transformer. *See In re A & R Marine Corp.*, 199 A.3d at 537. As such, we affirm the PUC's decision in favor of National Grid.[10]

## IV

## Conclusion

For the reasons stated herein, we affirm the decision and judgment of the PUC. We remand the record to the PUC with our decision endorsed thereon.

---

[10] Given our affirmance of the PUC's definition of "related facilities," no conflict exists between section (f) of the enabling act and the terms of the ISO-NE tariff. The ISO-NE tariff, Schedule 21-NEP, incorporates BIPCo's interconnection and backup transformer as DAF charges owed by BIPCo and its ratepayers. This scheme is not at odds with the cost allocation structure established in either section (f) or (g) of the enabling act. Absent any conflict, we need not reach the parties' arguments as to the tariff or preemption of FERC's plenary authority.

# STATE OF RHODE ISLAND

## SUPREME COURT – CLERK'S OFFICE

Licht Judicial Complex
250 Benefit Street
Providence, RI  02903



## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | In re Block Island Power Company Petition for Declaratory Judgment. |
| **Case Number** | No. 2020-115-M.P. (Docket No. 4688) |
| **Date Opinion Filed** | February 10, 2023 |
| **Justices** | Suttell, C.J., Goldberg, Robinson, Lynch Prata, Long, JJ. |
| **Written By** | Chief Justice Paul A. Suttell |
| **Source of Appeal** | The Rhode Island Public Utilities Commission |
| **Judicial Officer from Lower Court** | N/A |
| **Attorney(s) on Appeal** | For Petitioner:<br><br>Leah J. Donaldson, Esq. |
| | For Respondent:<br><br>Tiffany A. Parenteau, Esq.<br>Christine E. Dieter, Esq. |